UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NAYDA ALVAREZ,<br>    c/o Public Citizen Litigation Group<br>    1600 20th Street NW<br>    Washington, DC 20009,<br><br>LEONEL ROMEO ALVAREZ,<br>    c/o Public Citizen Litigation Group<br>    1600 20th Street NW<br>    Washington, DC 20009,<br><br>YVETTE GAYTAN,<br>    c/o Public Citizen Litigation Group<br>    1600 20th Street NW<br>    Washington, DC 20009,<br><br>and<br><br>FRONTERA AUDUBON SOCIETY,<br>    1101 S. Texas Boulevard<br>    Weslaco, TX 78596,<br><br>                    Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, President of the United States,<br>        1600 Pennsylvania Avenue NW<br>        Washington, DC 20500,<br><br>UNITED STATES OF AMERICA,<br><br>and<br><br>PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense,<br>        1000 Defense Pentagon<br>        Washington, DC 20301-1000,<br><br>                    Defendants. | Case No. 19-cv-404<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

INTRODUCTION

1.     This action seeks declaratory and injunctive relief with respect to President Donald Trump's declaration of a national emergency, issued on February 15, 2019 (the Declaration), the invocation of emergency powers stemming from that declaration, the resulting agency actions taken or directed to be taken in the exercise of those claimed emergency powers, and the expenditure of funds to construct a border wall in the absence of the constitutionally required appropriations and statutory authorization for such expenditures. Rather than responding to an emergency requiring immediate action, the Declaration seeks to address a long-running disagreement between the President and Congress about whether to build a wall along the southwestern border and Congress's refusal to appropriate funds for that purpose. However, under our Constitution, built on the principle of separation of powers, a disagreement between the President and Congress about how to spend money does not constitute an emergency authorizing unilateral executive action. The Declaration and the planned expenditure of Department of Defense funds for construction of the wall exceed President Trump's authority under the National Emergencies Act, other statutes invoked by the President as authority to fund the wall, and the Constitution. The invocation of emergency powers and exercise of those powers, and the diversion of funds to build a wall, are thus contrary to law.

2.     Plaintiffs include three landowners in South Texas who were informed that the federal government would seek to build a wall on their properties if money were available in 2019 for construction of a border wall. The construction of a wall pursuant to the Declaration threatens an imminent invasion of their privacy and the quiet enjoyment of their land, both during construction and after. Plaintiffs also include a non-profit environmental organization in Texas,

whose members' ability to observe wildlife will be impaired by the construction of a border wall and the resulting destruction of critical habitat.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction under 28 U.S.C. § 1331.

4.  Venue is proper in this district because defendants include "officer[s] or employee[s] of the United States or any agency thereof acting in [their] official capacity or under color of legal authority, or an agency of the United States, or the United States," at least one defendant resides in this district, and a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(e)(1).

## PARTIES

5.  Plaintiff Nayda Alvarez is a resident of Starr County, Texas. Her home is on an approximately one-acre lot that extends to the Rio Grande River. Her lot is adjacent to an approximately six-acre tract of land bordering the river that has been in her family for at least five generations. The back of her house is about 200 feet from the river. The land closest to the river is unstable and subject to erosion.

6.  In September 2018, Ms. Alvarez received a letter from U.S. Customs and Border Protection (CBP) requesting written permission to enter upon her land for survey and site assessment in anticipation of construction of "border security tactical infrastructure, such as border walls, lighting, and roads." In January 2019, Ms. Alvarez received another letter from CBP, stating that CBP anticipated filing a "Declaration of Taking and Complaint in Condemnation" in the U.S. District Court for the Southern District of Texas to gain right of entry upon her land.

7.  On information and belief, the proposed border wall will pass through Ms. Alvarez's property and will be built within feet of the back of her house. According to maps of the

proposed construction area, the border wall will be part of an approximately 150-foot wide enforcement zone that will include a 25-foot wide maintenance road. The wall and the enforcement zone will injure Ms. Alvarez in a number of ways. Specifically, she will be cut off from the portion of her property that will be south of the wall, and she will lose the use and enjoyment of almost her entire backyard. The movement of heavy machinery to construct the wall threatens to damage her home. She will suffer an invasion of her privacy and the quiet enjoyment of her land both during construction and after, when the view from her back door will be of a large wall, rather than the river view that she currently enjoys.

8.     Plaintiff Leonel Romeo Alvarez is a resident of Starr County, Texas. His home is on an approximately one-acre lot that is adjacent to an approximately six-acre tract of land bordering the Rio Grande River that has been in his family for at least five generations. The six-acre lot was owned by his father, Requerio Alvarez, until his death. Mr. Alvarez is one of multiple heirs with an ownership interest in that property. The land closest to the river is unstable and subject to erosion.

9.     In September 2018, Mr. Alvarez received a letter from CBP requesting written permission to enter upon his land for survey and site assessment in anticipation of construction of "border security tactical infrastructure, such as border walls, lighting, and roads." In January 2019, Mr. Alvarez received another letter from CBP, stating that CBP anticipated filing a "Declaration of Taking and Complaint in Condemnation" in the U.S. District Court for the Southern District of Texas to gain right of entry upon his land.

10.    On information and belief, the proposed border wall will pass through Mr. Alvarez's property and the six-acre parcel of his family's land adjacent to his lot. According to maps of the proposed construction area, the border wall will be part of an approximately 150-foot

4

wide enforcement zone. The wall and the enforcement zone will impact Mr. Alvarez in a number of ways. Specifically, he will be cut off from his family's property that will be south of the wall and he will lose the use and enjoyment of that land. The movement of heavy machinery to construct the wall threatens to damage his home. He will suffer an invasion of his privacy and the quiet enjoyment of his land both during construction and after.

11. Plaintiff Yvette Gaytan is a resident of Starr County, Texas. Her home is on an approximately one-half-acre lot near the Rio Grande River that she inherited from her father following his death in 2015. The back of her house is about 400 feet from the river, and her lot extends about 50 feet behind her house. The approximately 350-foot strip of land between Ms. Gaytan's property and the river was owned by her grandfather until his death. Ms. Gaytan is one of multiple heirs with an ownership interest in that property. The land behind Ms. Gaytan's house sits on a bluff overlooking the river, and the land closest to the river is unstable and subject to erosion.

12. In September 2018, Ms. Gaytan received letters at her home from CBP. The letters were addressed to Ms. Gaytan's late father and grandfather and requested written permission to enter upon Ms. Gaytan's and her family's land for survey and site assessment in anticipation of construction of "border security tactical infrastructure, such as border walls, lighting, and roads." In January 2019, Ms. Gaytan received another round of letters from CBP, stating that CBP anticipated filing a "Declaration of Taking and Complaint in Condemnation" in the U.S. District Court for the Southern District of Texas to gain right of entry upon her and her family's land.

13. On information and belief, the proposed border wall will pass through Ms. Gaytan's property or her family's property immediately south of her lot. According to maps of the proposed construction area, the border wall will be part of an approximately 150 foot wide enforcement

zone. Regardless of which parcel will contain the border wall and the enforcement zone, it will impact Ms. Gaytan. Specifically, she will be cut off from the portion of her property that will be south of the wall. The movement of heavy machinery to construct the wall threatens to damage her home. She will suffer an invasion of her privacy and the quiet enjoyment of her land both during construction and after, when the view from her back door will be of a large wall, rather than the river view that she currently enjoys.

14. Plaintiff Frontera Audubon Society is a nonprofit, membership organization founded in 1975. Frontera Audubon is headquartered on a 15-acre nature preserve in the City of Weslaco, Texas, in the Rio Grande Valley. Frontera Audubon is dedicated to preserving wildlife and the native habitat of the Rio Grande Valley.

15. The Rio Grande Valley is one of the most biologically diverse regions in North America. It provides over three-quarters of America's bird species with migratory, nesting, and feeding habitat. It is home to many tropical bird species found nowhere else in the United States, and is a major bird migration corridor that includes the convergence of two major flyways.

16. Many of Frontera Audubon's members are avid birdwatchers and nature enthusiasts. Beginning in 1980, Frontera Audubon began advocating for the creation of a wildlife corridor along the last 250 miles of the Rio Grande River. Wildlife corridors are tracts of land or habitat that are linked and allow wildlife to travel from one location to another to find food, shelter, a mate and a place to raise their young. A wildlife corridor is particularly critical in the Rio Grande Valley, where approximately 95 percent of the native habitat has been cleared for agriculture or development.

17. Assisted by the efforts of Frontera Audubon and others, the Lower Rio Grande Valley National Wildlife Refuge has been painstakingly created to provide a wildlife corridor

along the Rio Grande River. The tracts of land that make up the wildlife corridor are slowly being connected and restored for the benefit of wildlife. The tracts include land managed by private landowners, nonprofit organizations, the State of Texas, and two other National Wildlife Refuges, Laguna Atascosa and Santa Ana.

18. Frontera Audubon's members regularly visit the various tracts that make up the wildlife corridor, including those along the Rio Grande River, to view birds and other wildlife. If the proposed border wall and accompanying 150 foot enforcement zone are constructed, Frontera Audubon members will be cut off from access to many of these areas because they will be south of the wall. Further, construction of the border wall and accompanying enforcement zone will require the destruction of a significant portion of the small amount of remaining habitat along the river. Many of the birds and other wildlife that inhabit the wildlife corridor are dependent on access to brush that is in close proximity to water. Construction of the border wall will trap wildlife on one side of the wall or the other, and will allow no escape route for terrestrial wildlife when the Rio Grande is in flood conditions, which happens approximately every 10 years. The sliver of wildlife-sustaining brush and forest along the river will be significantly impacted by further border wall construction and its associated clearing, lighting, and traffic. The ability of Frontera Audubon's members to birdwatch and experience nature along the river will be severely curtailed.

19. Defendant Donald J. Trump is the President of the United States and issued the Declaration of National Emergency challenged in this complaint. Plaintiffs sue President Trump in his official capacity.

20. Defendant Patrick M. Shanahan is the Acting Secretary Defense and is sued in his official capacity. He is the highest ranking official at the U.S. Department of Defense, and is charged with the supervision and management of the decisions and actions of that agency.

BACKGROUND

21. During the 2015–2016 presidential campaign, candidate Donald Trump inspired attendees at his campaign rallies to chant "Build that wall." Although the border with Mexico is approximately 2,000 miles long, he stated that the wall along that border would be 1,000 miles long.

22. Candidate Trump repeatedly stated during his campaign that Mexico would pay for the border wall he described.

23. On becoming President, Donald Trump learned that he could not force either Mexico or the United States Congress to pay for a 1,000-mile border wall. President Trump nonetheless has continued to insist that he will build the wall.

24. In 2017, Congress appropriated $1.6 billion for new and replacement fencing along the border, but not for the wall prototypes requested by the President.

25. In 2018, the President asked Congress to appropriate $5.7 billion for construction of 234 miles of steel border wall. Congress did not pass appropriations bills including those requested funds.

26. On December 21, 2018, the President allowed portions of the federal government to shut down, rather than approve an appropriations bill that did not include the funding he requested for a border wall.

27. On February 14, 2019, Congress passed an appropriations bill that provides $1.375 billion for 55 miles of new fence along the border in Texas. Despite the President's repeated requests for $5.7 billion for 234 miles of steel wall, and despite the President's earlier decision allowing the government to shut down because Congress declined to appropriate money for that wall, Congress again appropriated no money for a steel wall.

Declaration of a National Emergency and Invocation of Statutory Authority

28. On February 15, 2019, the President signed the appropriations bill into law. That same day, he signed a proclamation declaring a national emergency under the National Emergencies Act (NEA).

29. The NEA provides: "With respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency." 50 U.S.C. § 1621.

30. The NEA authorizes the president to access "special or extraordinary power" conferred by Congress for use during a national emergency only when a national emergency exists.

31. In answering a press question about the Declaration, the President conceded that the situation at the southern border does not require a declaration of national emergency. He stated: "I could do the wall over a longer period of time. I didn't need to do this, but I'd rather do it much faster."[1]

32. The Declaration invokes authority provided under 10 U.S.C. § 2808, which authorizes the Secretary of Defense, in the event that the President declares a national emergency under the NEA, to undertake military construction projects not otherwise authorized by law, using funds appropriated for military construction and that have not been otherwise obligated.

33. Not only is the necessary predicate for invocation of section 2808—a lawful declaration of a national emergency—absent here, but the specific requirements of section 2808 are also not satisfied: The planned border wall is not a "military construction project" that is "necessary to support … use of the armed forces." 10 U.S.C. § 2808(a).

---

[1] https://www.axios.com/trump-national-emergency-didnt-need-to-do-this-66a1dd89-6995-4be8-a215-058a12ada689.html.

34. A White House fact sheet issued on February 15, 2019, stated that, in addition to invoking section 2808, the President would direct, under 10 U.S.C. § 284, that as much as $2.5 billion appropriated to the Department of Defense be transferred to provide funding for the wall.

35. Section 284(b) authorizes allocation of funds appropriated to the Department of Defense to support counterdrug activities of other agencies, on notification of relevant congressional committees. In particular, section 284(b)(7) allows the Secretary of the Department to authorize funding of antidrug agencies' "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."

36. The authorization to transfer funds to construct fencing to block drug smuggling does not authorize use of transferred funds for the construction of the planned border wall.

Immigration across the Southern Border

37. No national emergency exists with respect to immigration across the southern border of the United States.

38. Migration through the southern border is not sudden or unforeseen.

39. Significant immigration across the border dates back more than 100 years, and the current rate is lower than the average over the past decade.

40. Combining several methods of estimating unlawful border crossings, the Department of Homeland Security (DHS) calculated a "91 percent decline" in such crossings over the period 2000 to 2016: "1.8 million aliens successfully crossed the border in 2000, versus 170,000 in 2016." DHS Office of Immigration Statistics, Efforts by DHS to Estimate Southwest Border Security between Ports of Entry 17 (Sept. 2017) ("DHS 2017 Estimate").[2]

---

[2] https://www.dhs.gov/sites/default/files/publications/17_0914_estimates-of-border-security.pdf.

41. CBP reported a 76 percent decline in the number of apprehensions (which is one measure of illegal border crossings) between the peak in 2000 and 2018. *Compare* CBP, *Southwest Border Migration FY2019*,[3] *with* U.S. Border Patrol, *Southwest Border Sectors: Total Illegal Alien Apprehensions by Fiscal Year*.[4]

42. According to CBP, 396,579 persons were arrested for attempting to cross illegally along the southwest border in the year ending October 1, 2018, as compared to an average of 400,571 per year over the previous decade, and an average of 413,377 apprehensions per year during President Obama's administration. *See* CBP, Southwest Border Migration FY2019[5]; CBP, Southwest Border Sectors.[6]

43. Although the number of arrests of people for attempting to illegally cross the border was higher in 2018 than in 2017, it is lower than the number of border arrests in 2016, 2014, and 2013. *See* CBP, Southwest Border Sectors. And the number in 2017 was the lowest since 1971. *Id.*

44. DHS has explained that "deterrence essentially is just as important as apprehensions in preventing illegal" immigration, and that deterrence rates—measured based on the number of deportees who express an intention to return to the United States within 7–90 days—have been high and stable for several years. DHS 2017 Estimate at 11.

45. According to DHS estimates, the growth of the population of immigrants illegally in this country has slowed considerably. The population increased by 470,000 per year from 2000

---

[3] https://www.cbp.gov/newsroom/stats/sw-border-migration.

[4] https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Southwest%20Border%20Sector%20Apps%20FY1960%20-%20FY2017.pdf.

[5] https://www.cbp.gov/newsroom/stats/sw-border-migration.

[6] https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Southwest%20Border%20Sector%20Apps%20FY1960%20-%20FY2017.pdf.

to 2007, but only by 70,000 per year from 2010 to 2015. DHS, *Population Estimates: Illegal Alien Population Residing in the United States: January 2015*, at 3, 12 (Dec. 2018).[7] Moreover, the vast majority of people living in the country illegally have been here for 10 years or more. According to DHS, in 2015, nearly 80 percent of such individuals had lived in the U.S. for more than a decade, and only six percent had lived in the U.S. for fewer than five years. *Id.* at 4. In addition, a 2017 report found that "[n]early twice as many left the undocumented population from Mexico than arrived in the 2008 to 2015 period—1.7 million left the population and 900,000 arrived." Robert Warren, *Zero Undocumented Population Growth Is Here to Stay and Immigration Reform Would Preserve and Extend These Gains*, 5 J. Migr. & Human Soc'y 491, 492 (2017).[8]

46. Undocumented immigrants are arrested for and convicted of crimes at significantly lower rates than native-born Americans. *See, e.g.*, Alex Nowrasteh, *Criminal Immigrants in Texas: Illegal Immigrant Conviction and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes*, Cato Institute (Feb. 26, 2018).[9]

47. The President's assertions that immigration poses a threat have rested in part on claims that criminals are crossing the southern border.[10] However, "[a]s a percentage of their respective populations, there were 50 percent fewer criminal convictions of illegal immigrants than of native-born Americans in Texas in 2015." Alex Nowrasteh, *supra.* "The criminal conviction rate for legal immigrants was about 85 percent below the native-born rate." *Id.*

---

[7] https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf.

[8] https://journals.sagepub.com/doi/pdf/10.1177/233150241700500214.

[9] https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-texas-illegal-immigrant.

[10] Donald J. Trump, Official Tweet, January 5, 2019 (accessed Feb. 4, 2019), available at https://twitter.com/realdonaldtrump/status/1081570073867927557.

48. States with larger shares of undocumented immigrants tended to have lower crime rates than states with smaller shares in the years 1990 through 2014. "Increases in the undocumented immigrant population within states are associated with significant decreases in the prevalence of violence." Michael Light, *Does Undocumented Immigration Increase Violent Crime?*, 56 J. of Criminology 370 (May 2018).

49. Although about 17,000 adults encountered by border security officials in fiscal year 2018 had at least one past criminal conviction at the time of their apprehension (down from 19,000 in 2017, and 27,000 in 2016),[11] data from CBP reveals that, in 2018, about 60 percent of those individuals were apprehended at lawful ports of entry—not between them.[12] Of the remaining 6,000 or so individuals, nearly half of their criminal convictions were for unlawfully crossing the border in the past.[13]

50. The Department of State reported in 2017 that there is "no credible information that any member of a terrorist group has traveled through Mexico to gain access to the United States."[14] Consistent with that statement, one study, canvassing all terror attacks on U.S. soil between 1975 and 2015, found that the chance of being murdered in the United States by a terrorist attack committed by an undocumented immigrant is 1 in 10.9 billion. *See* Alex Nowrasteh, *Terrorism and Immigration*, Cato Institute, at 5 (Sept. 13, 2016).[15]

---

[11] *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (data through August 31, 2018).

[12] *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.

[13] *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-alien-statistics (reporting that 3,637 of the 7,820 past convictions—about 46.5%—were for illegal reentry).

[14] U.S. Dep't of State, Bureau of Counterterrorism, Country Reports on Terrorism 2016, at 290 (July 2017), https://www.state.gov/documents/organization/272488.pdf.

[15] https://object.cato.org/sites/cato.org/files/pubs/pdf/pa798_2.pdf.

51. According to a 2018 report by the Drug Enforcement Administration, most heroin smuggled into the country is brought in vehicles through "legal ports of entry, followed by tractor-trailers, where the heroin is co-mingled with legal goods." DEA, *2018 National Drug Threat Assessment*, 19 (Oct. 2018).[16]

52. The foregoing facts concerning immigration across the southern border render the President's Declaration that the absence of a wall in the areas where construction is planned is an "emergency" within the meaning of 50 U.S.C. § 1621 legally untenable and an impermissible basis for seeking to obligate funds that Congress has refused to appropriate for a border wall.

## FIRST CAUSE OF ACTION

(Non-statutory review of ultra vires action; violation of separation of powers)

53. Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

54. Article I, Section 1 of the Constitution assigns the role of making laws to Congress, and Article I, Section 9 specifies that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

55. Federal legislation, including laws appropriating money, must be passed by both chambers of Congress before it may be presented to the President and, if signed, become law. U.S. Const., art. I.

56. In 2017 and 2018, Congress declined to appropriate money for a border wall.

---

[16] https://www.dea.gov/sites/default/files/2018-11/DIR-032-18%202018%20NDTA%20final%20low%20resolution.pdf.

57. The Constitution vests executive power in the President. U.S. Const., art. II. The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

58. The president has no inherent authority to declare emergencies to override appropriations laws and other laws enacted by Congress; his emergency powers are defined and limited by statute.

59. Because no national emergency exists with respect to immigration across the southern border, the President's Declaration exceeds the limited authority delegated to the President to declare national emergencies and invoke specific statutory powers conferred by Congress to act in such an emergency.

60. Because the emergency declaration is unlawful, the President lacks statutory authority to direct the spending of funds for that purpose; the expenditure of monies from the United States Treasury for a border wall for which Congress has refused to appropriate funds violates Article I of the Constitution.

61. Because no national emergency exists with respect to immigration across the southern border, the President's invocation of emergency powers through the Declaration usurps legislative authority conferred by the Constitution on the Congress.

62. The Declaration and invocation of emergency powers pursuant to the Declaration violate the separation of powers.

63. Plaintiffs and members of Frontera Audubon will suffer irreparable injury if the Declaration and invocation of authority under 10 U.S.C. § 2808 are not declared unlawful, and plaintiffs and members of Frontera Audubon have no adequate remedy at law.

## SECOND CAUSE OF ACTION

(Non-statutory review of ultra vires action; violation of separation of powers)

64. Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

65. In the Declaration, the President declared that the "emergency" requires use of the Armed Forces and invoked the construction authority provided by 10 U.S.C. § 2808.

66. Because the requirements for invocation of 10 U.S.C. § 2808 are not satisfied, reliance on section 2808 to authorize use of funds appropriated for other purposes usurps legislative authority conferred by the Constitution on the Congress.

67. President's direction to use the authority set forth in 10 U.S.C. § 2808 for the purpose of constructing a border wall is ultra vires and violates the separation of powers.

68. Plaintiffs and members of Frontera Audubon will suffer irreparable injury if the invoke 10 U.S.C. § 2808 is not declared unlawful, and plaintiffs and members of Frontera Audubon have no adequate remedy at law.

## THIRD CAUSE OF ACTION

(Non-statutory review of ultra vires action; violation of separation of powers)

69. Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

70. Because transferring funds to construct a border wall is not authorized by 10 U.S.C. § 284, the President's direction to use Defense Department funds appropriated for other purposes

for the purpose of constructing a border wall directs action contrary to law and usurps legislative authority conferred by the Constitution on the Congress.

71.     The President's direction to transfer funds pursuant to 10 U.S.C. § 284 for the purpose of constructing a border wall is ultra vires and violates the separation of powers.

72.     Plaintiffs and members of Frontera Audubon will suffer irreparable injury if the direction to transfer funds pursuant to 10 U.S.C. § 284 is not declared unlawful, and plaintiffs and members of Frontera Audubon have no adequate remedy at law.

FOURTH CAUSE OF ACTION

(Non-statutory review of ultra vires action by defendant Secretary of Defense)

73.     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

74.     The Secretary of Defense may act only pursuant to authority lawfully delegated by Congress or the President.

75.     When declaring a national emergency, the President declared that the "emergency" requires use of the Armed Forces and invoked the construction authority provided by 10 U.S.C. § 2808.

76.     Because the requirements for invocation of 10 U.S.C. § 2808 are not satisfied, reliance on section 2808 to authorize use of funds appropriated for other purposes usurps legislative authority conferred by the Constitution on the Congress.

77.     Use of military construction funds pursuant to 10 U.S.C. § 2808 to construct a border wall violates the separation of powers.

78.     Plaintiffs and members of Frontera Audubon will suffer irreparable injury if the Secretary of Defense takes action to build a wall in reliance on the Declaration or in implementing

the President's direction to use military construction funds pursuant to 10 U.S.C. § 2808, and plaintiffs and members of Frontera Audubon have no adequate remedy at law.

### FIFTH CAUSE OF ACTION

(Non-statutory review of ultra vires action by defendant Secretary of Defense)

79. Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

80. The Secretary of Defense may act only pursuant to authority lawfully delegated by Congress or the President.

81. Because transferring funds to construct a border wall is not authorized by 10 U.S.C. § 284, implementation of the President's direction to do so would exceed the authority of the Secretary of Defense under that statute, and would be ultra vires, arbitrary, capricious, and contrary to law.

82. Plaintiffs and members of Frontera Audubon will suffer irreparable injury if the Secretary of Defense takes action to build a wall in reliance on the Declaration or in implementing the President's direction to transfer funds pursuant to 10 U.S.C. § 284, and plaintiffs and members of Frontera Audubon have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A) Declare the Declaration, and the President's direction that the Defense Department reallocate funds to support construction of a border wall under 10 U.S.C. §§ 284 and 2808, to be in excess of presidential authority under Article II of the Constitution, an infringement on legislative authority, and invalid; and

(B)     Declare that defendants cannot lawfully use Defense Department funds for construction of a border wall under 10 U.S.C. § 284 or § 2808;

(C)     Enjoin defendant Shanahan from taking action to build a wall using Defense Department funds under 10 U.S.C. §§ 284 and 2808, or on any basis that depends on the President's unlawful emergency declaration;

(D)     Grant such other relief as this Court may deem just and proper.

Dated: February 15, 2019                    Respectfully submitted,

  /s/ Allison M. Zieve
Allison M. Zieve
(DC Bar No. 424786)
Michael T. Kirkpatrick
(DC Bar No. 486293)
Scott L. Nelson
(DC Bar No. 413548)
Rebecca Smullin
(DC Bar No. 1017451)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000