# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NAYDA ALVAREZ, *et al.*, | |
| Plaintiffs, | |
| v. | No. 19-cv-00404 (TNM) |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, *et al.*, | |
| Defendants. | |

## DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants respectfully move to dismiss Plaintiffs' Complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.  The bases for this Motion are set forth in the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss.  A proposed order is also attached.

Dated:  April 2, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Andrew I. Warden
ANDREW I. WARDEN (IN Bar 23840-49)
Senior Trial Counsel, Federal Programs Branch

/s/ *Kathryn C. Davis*
KATHRYN C. DAVIS (D.C. Bar No. 985055)

MICHAEL J. GERARDI (D.C. BAR NO. 1017949)
LESLIE COOPER VIGEN (D.C. Bar No. 1019782)
RACHAEL WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Tel: (202) 616-8298
Fax: (202) 616-8470
E-mail: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NAYDA ALVAREZ, *et al.*,

                       Plaintiffs,

     v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America, *et al.*,

                       Defendants.

No. 19-cv-00404 (TNM)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................1

BACKGROUND .............................................................................................................................3

I.     Congress's Express Authorization of Barrier Construction Along the U.S.-Mexico Border .................................................................................................................................3

II.    DHS's Recent Efforts to Expedite Border Barrier Construction ..................................5

III.   Congress's Authorization for U.S. Military Support of DHS's Border Security Efforts ..........5

IV.   DoD's Current Support for DHS's Efforts to Secure the Southern Border .............................7

V.    The President's Proclamation Declaring a National Emergency at the Southern Border ................................................................................................................................8

VI.   The Use of Spending Authorities for Barrier Construction .......................................................10

STATUTORY FRAMEWORK .....................................................................................................10

I.     National Emergencies Act ...............................................................................................10

II.    10 U.S.C. § 284 ...............................................................................................................15

III.   10 U.S.C. § 2808 .............................................................................................................16

PLAINTIFFS' CLAIMS ...............................................................................................................18

STANDARD OF REVIEW ...........................................................................................................19

ARGUMENT .................................................................................................................................20

I.     The Court Lacks Jurisdiction ...........................................................................................20

       A.    Plaintiffs' Challenge to the President's Declaration of a National Emergency Should Be Dismissed ................................................................................................20

              1.    The NEA Evidences Congress's Intent to Preclude Judicial Review .............21

              2.    Plaintiffs' Challenge to the President's National Emergency Declaration Presents a Nonjusticiable Political Question ..............................24

              3.    The President Should Be Dismissed as a Party to this Lawsuit Because There is No Cause of Action Against the President and Plaintiffs Cannot Obtain Equitable Relief Against the President ..................28

       B.    Plaintiffs Have Not Alleged Article III Standing ..............................................31

   1.  Plaintiffs do not satisfy the traceability and redressability prongs of Article III's standing requirement ...................................................................31

     a.  Plaintiffs do not satisfy the traceability prong......................................32

     b.  Plaintiffs do not satisfy the redressability prong..................................35

   2.  Plaintiffs Cannot Establish Article III Standing to Challenge Future Border Barrier Construction Under § 2808 ......................................................36

II. Plaintiffs' Ultra Vires and Constitutional Claims Do Not State a Claim on Which Relief Can Be Granted............................................................................................37

 A.  Plaintiffs' "Ultra Vires" Claims Must Be Dismissed ........................................38

   1.  Plaintiffs Fail To State a Claim for Ultra Vires Action Against the President.....................................................................................................38

   2.  Plaintiffs Must Raise Their Statutory Challenges Under the APA .................39

   3.  Plaintiffs Have Not Alleged Any Ultra Vires Actions......................................40

     a.  10 U.S.C. § 2808 ...................................................................................41

     b.  10 U.S.C. § 284 .....................................................................................42

 B.  Plaintiffs' Constitutional Claims Must Be Dismissed.........................................43

CONCLUSION.................................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*AFLCIO v. Kahn,*
  618 F.2d 784 (D.C. Cir. 1979) ............................................................................45

*Al-Aulaqi v. Panetta,*
  35 F. Supp. 3d 56 (D.D.C. 2014) ..........................................................................4

*Allen v. Wright,*
  468 U.S. 737 (1984) ............................................................................................32

*Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n,*
  135 S. Ct. 2652 (2015)........................................................................................22

*Arizona v. United States,*
  567 U.S. 387 (2012)............................................................................................27

*Armstrong v. Exceptional Child Ctr., Inc.,*
  135 S. Ct. 1378 (2015) .................................................................................. 29, 40

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...............................................................................19, 33, 42

*\*Baker v. Carr,*
  369 U.S. 186 (1962)...................................................................................... 25, 26

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
  502 U.S. 32 (1991) ..............................................................................................39

*Beacon Prods. Corp. v. Reagan,*
  633 F. Supp. 1191 (D. Mass. 1986), *aff'd,* 814 F.2d 1 (1987)........................ 22, 24

*Beacon Prods. Corp. v. Reagan,*
  814 F.2d 1 (1st Cir. 1987) ............................................................................. 14, 22

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)...................................................................................... 19, 42

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) ...................................................................................... 21, 23

*Byrd v. EPA,*
  174 F.3d 239 (D.C. Cir. 1999) ............................................................................31

*CASA de Maryland, Inc. v. Trump,*
  355 F. Supp. 3d 307 (D. Md. 2018) ....................................................................31

*Cause of Action Inst. v. Eggleston,*
    224 F. Supp. 3d 63 (D.D.C. 2016) ........................................................................20

*Centro Presente v. DHS,*
    332 F. Supp. 3d 393 (D. Mass. 2018) ...................................................................31

\*Chamber of Commerce v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) .............................................................................40

*Chang v. United States,*
    859 F.2d 893 (Fed. Cir. 1988) .............................................................................24

*Chichakli v. Szubin,*
    2007 WL 9711515 (N.D. Tex. June 4, 2007), *aff'd in part, vacated in part,*
    546 F.3d 315 (5th Cir. 2008) ...............................................................................24

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................................... 34, 36, 37

*D & D Landholdings v. United States,*
    82 Fed. Cl. 329 (2008) ..........................................................................................3

\*Dalton v. Specter,*
    511 U.S. 462 (1994) ....................................................................................*passim*

*Defs. of Wildlife v. Chertoff,*
    527 F. Supp. 2d 119 (D.D.C. 2007), *cert denied,* 554 U.S. 918 (2008) .............. 5, 28

*Dinh Tran v. Dep't of Treasury,*
    351 F. Supp. 3d 130 (D.D.C. 2019) .......................................................................4

*Dist. No. 1, Pacific Coast Dist., Marine Engineer's Beneficial Ass'n v. Maritime Admin.,*
    215 F.3d 37 (D.C. Cir. 2000) ...............................................................................41

*Doe 2 v. Trump,*
    319 F. Supp. 3d 539 (D.D.C. 2018) .....................................................................30

*Doe 2 v. Shanahan,*
    2019 WL 1086495 (D.C. Cir. Mar. 8, 2019) .......................................................28

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) ....................................................................... 19, 26

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ..............................................................................................28

*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) ......................................................................... 31, 35

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ........................................................................................29, 30, 39

*Freedom Republicans, Inc. v. Fed. Election Comm'n,*
13 F.3d 412 (D.C. Cir. 1994) ...............................................................................35

*Friends of Animals v. Jewell,*
115 F. Supp. 3d 107 (D.D.C. 2015) ......................................................................33

*Friends of the Earth, Inc. v. Laidlaw Env't Srvs., Inc.,*
528 U.S. 167 (2000) ..............................................................................................35

*Griffith v. FLRA,*
842 F.2d 487 (D.C. Cir. 1988) .................................................................40, 41, 43

*Gringo Pass, Inc. v. Kiewit Sw. Co.,*
2012 WL 12905166 (D. Ariz. Jan. 11, 2012) .........................................................7

*Grupo Mexicano De Desarrollo v. All. Bond Fund,*
527 U.S. 308 (1999) ..............................................................................................29

*Haitian Refugee Ctr. v. Gracey,*
809 F.2d 794 (D.C. Cir. 1987) ..............................................................................32

*Harvard Pilgrim Health Care of New Eng. v. Thompson,*
318 F. Supp. 2d 1 (D.R.I. 2004) ...........................................................................45

*Hawaii v. Trump,*
859 F.3d 741 (9th Cir. 2017), *vacated as moot,* 138 S. Ct. 377 (2017) .................30

*In re Border Infrastructure Envtl. Litig.,*
915 F.3d  (9th Cir. 2019) .........................................................................................5

*INS v. Chadha,*
462 U.S. 919 (1983) ..............................................................................................14

*Interstate Nat. Gas Ass'n of Am. v. FERC,*
285 F.3d 18 (D.C. Cir. 2002), *aff'd,* 828 F.3d 989 (D.C. Cir. 2016) ...................33

*Int'l Refugee Assistance Project v. Trump,*
857 F.3d 554 (4th Cir. 2017), *vacated and remanded,* 138 S. Ct. 353 (2017)........30

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
478 U.S. 221 (1986) ..............................................................................................25

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.,*
58 F. Supp. 3d 1191 (D.N.M. 2014) .....................................................................45

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.,*
402 F.3d 1249 (D.C. Cir. 2005) ...............................................................................19

*Kaempe v. Myers,*
367 F.3d 958 (D.C. Cir. 2004) .................................................................... 4, 20, 43

*Karahalios v. Nat'l Fed'n of Fed. Emps., Local,*
*1263,* 489 U.S. 527 (1989) ......................................................................................23

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) .................................................................................................27

*Leedom v. Kyne,*
358 U.S. 184 (1958) ........................................................................................ 39, 41

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) .................................................................................................31

*Massachusetts v. EPA,*
549 U.S. 497 (2007) .................................................................................................19

*Mathews v. Diaz,*
426 U.S. 67 (1976) ...................................................................................................28

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,*
453 U.S. 1 (1981) .....................................................................................................21

*\*Mississippi v. Johnson,*
71 U.S. (4 Wall.) 475 (1866) ......................................................................23, 29, 30

*Mittleman v. Postal Regulatory Comm'n,*
757 F.3d 300 (D.C. Cir. 2014) ...............................................................................41

*N. Am. Butterfly Ass'n v. Nielsen,*
2019 WL 634596 (D.D.C. Feb. 14, 2019) .................................................................5

*\*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Servs. Impasses Panel,*
437 F.3d 1256 (D.C. Cir. 2006) ....................................................................... 41, 43

*Nat'l Ass'n of Gov. Emps. v. Fed. Labor Relations Auth.,*
179 F.3d 946 (D.C. Cir. 1999) ...............................................................................38

*New Jersey v. United States,*
91 F.3d 463 (3d Cir. 1996) ......................................................................................27

*Newdow v. Roberts,*
603 F.3d 1002 (D.C. Cir. 2010) .............................................................................30

*NFFE v. United States*,
  905 F.2d 400 (D.C. Cir. 1990) ..........................................................................42

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ............................................................................... 23, 29

*Nyunt v. Chairman, Broad. Bd. of Governors*,
  589 F.3d 445 (D.C. Cir. 2009) ..........................................................................40

*Plyler v. Doe*,
  457 U.S. 202 (1982) ..........................................................................................26

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) ........................................................................19

*Puerto Rico v. United States*,
  490 F.3d 50 (1st Cir. 2007) ..............................................................................40

*Raytheon Co. v. Ashborn Agencies, Ltd.*,
  372 F.3d 451 (D.C. Cir. 2004) ..........................................................................31

*Rodriquez v. Laboratory Corp. of America Holdings*,
  13 F. Supp. 3d 121 (D.D.C. 2014) ....................................................................43

*Sadowski v. Bush*,
  293 F. Supp. 2d 15 (D.D.C. 2003) ....................................................................27

*Saget v. Trump*,
  345 F. Supp. 3d 287 (E.D.N.Y. 2018) ..............................................................31

*Santiago v. Rumsfeld*,
  2004 WL 3008724 (D. Or. Dec. 29, 2004), *aff'd*, 403 F.3d 702 (9th Cir. 2005) and
  407 F.3d 1018 (9th Cir. 2005) ..........................................................................24

*Sardino v. Fed. Reserve Bank of N.Y.*,
  361 F.2d 106 (2d Cir. 1966) ..............................................................................24

*Save Our Heritage v. Gonzalez*,
  533 F. Supp. 2d 58 (D.D.C. 2008) ......................................................................5

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) .....................................................................31, 32

*Soudavar v. Bush*,
  46 F. App'x 731 (5th Cir. 2002) ........................................................................24

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .....................................................................................31, 35

*Susan B. Anthony List v. Driehaus,*
  134 S. Ct. 2334 (2014)...................................................................................................36

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) ..........................................................................29, 30, 31

*Tenet v. Doe,*
  544 U.S. 1 (2005) ..........................................................................................................30

*Tex. Border Coal. v. Napolitano,*
  614 F. Supp. 2d 54 (D.D.C. 2009) ................................................................................32

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) .......................................................................................40

*United States v. Amirnazmi,*
  645 F.3d 564 (3d Cir. 2011) ...............................................................................14, 21, 24

*United States v. Brignoni-Ponce,*
  422 U.S. 873 (1975) ......................................................................................................26

*United States v. Delgado-Garcia,*
  374 F.3d 1337 (D.C. Cir. 2004) ....................................................................................28

*United States v. Groos,*
  616 F. Supp. 2d 777 (N.D. Ill. 2008) ............................................................................24

*United States v. Spawr Optical Research, Inc.,*
  685 F.2d 1076 (9th Cir. 1982)................................................................................. 24, 26

*United States v. Yoshida Int'l, Inc.,*
  526 F.2d 560 (Cust. & Pat. App. 1975) .........................................................................24

*Veterans and Reservists for Peace in Vietnam v. Regional Comm'r of Customs, Region II,*
  459 F.2d 676 (3d Cir. 1972) ..........................................................................................24

*Von Aulock v. Smith,*
  720 F.2d 176 (D.C. Cir. 1983) ......................................................................................32

*Winpisinger v. Watson,*
  628 F.2d 133 (D.C. Cir. 1980) ................................................................................. 32, 33

*Wise v. Glickman,*
  257 F. Supp. 2d 123 (D.D.C. 2003) ..............................................................................40

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ................................................................................................. 44, 45

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) ............................................................................................ 30, 40

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
  566 U.S. 189 (2012) .................................................................................................... 26

## CONSTITUTIONAL PROVISION

U.S. Const. art. III, § 2 ................................................................................................ 31, 36

## STATUTES

5 U.S.C. § 702 ...................................................................................................................... 39

5 U.S.C. § 706 ................................................................................................................ 39, 45

8 U.S.C. § 1103 ...................................................................................................................... 3

10 U.S.C. § 284 ............................................................................................................ *passim*

10 U.S.C. § 2801 ........................................................................................................... 17, 42

10 U.S.C. § 2808 .......................................................................................................... *passim*

10 U.S.C. §§ 271-274 ............................................................................................................ 6

10 U.S.C. § 12302 ................................................................................................................. 8

31 U.S.C. § 9705 .......................................................................................................... 1, 34

50 U.S.C. § 1601 *et seq.* ................................................................................................ 8, 16

50 U.S.C. § 1621 ........................................................................................................... 11, 21

50 U.S.C. § 1622 ............................................................................................ 13, 14, 21, 22

50 U.S.C. § 1631 ........................................................................................................... 12, 21

50 U.S.C. § 1641 ........................................................................................................... 15, 21

Pub. L. No. 94-412, 90 Stat. 1255 (1976), (codified as amended at 50 U.S.C. §§ 1601-1651) ............. 10

Pub. L. No. 97-99, 95 Stat. 1359 (1981) ......................................................................... 16

Pub. L. No. 97-214, 96 Stat. 153 (1982) (codifying 10 U.S.C. §§ 2801-08) ........................... 16

Pub. L. No. 99-93, 99 Stat. 405 (1985) ........................................................................... 14

Pub. L. No. 101-510, 104 Stat. 1485 (1991) ................................................................... 15

Pub. L. No. 104-208, 110 Stat. 3009 (1996), as amended (codified at 8 U.S.C. § 1103). .......................4

Pub. L. No. 107-107, 115 Stat. 1012 (2001)...........................................................................................15

Pub. L. No. 109-13, 119 Stat. 231 (2005) ................................................................................................4

Pub. L. No. 109-367, 120 Stat. 2638 (2006)............................................................................................4

Pub. L. No. 110-161, 121 Stat. 2090 (2007)............................................................................................4

Pub. L. No. 115-141, 132 Stat. 348  (2018)...........................................................................................34

Pub. L. No. 116-6, 133 Stat. 13 (2019) ...........................................................................................10, 33

## OTHER LEGISLTIVE AUTHORITIES

H.R. Rep. No. 97-44 (1981) ...................................................................................................................17

H.R. Rep. No. 103-200, 1993 WL 298896 (1993)..............................................................................6, 16

H.R. Rep. No. 110-652 (2008) ...............................................................................................................16

H.R. Rep. No. 114-840 (2016) ...............................................................................................................16

S. Rep. No. 94-922 (1976) .....................................................................................................................10

S. Rep. No. 94-1168 (1976) ...................................................................................................................12

## RULES

Fed. R. Civ. P. 12 ...........................................................................................................................*passim*

## EXECUTIVE ORDERS AND PROCLAMATIONS

Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996).................................................................................13

Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001)............................................................................17

Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009).............................................................................12

Proc. No. 9398, 81 Fed. Reg. 9737 (Feb. 24, 2016) ..............................................................................13

Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) ......................................................................*passim*

Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990)..................................................................17

Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990) ...............................................................17

Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990) ...........................................................2, 13

Exec. Order No. 12938, 59 Fed. Reg. 58099 (Nov. 14, 1994) ........................................13

Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995) ........................................13

Exec. Order No. 13047, 62 Fed. Reg. 28301 (May 22, 1997) ..........................................2

Exec. Order No. 13194, 66 Fed. Reg. 7389 (Jan. 18, 2001) .........................................12

Exec. Order No. 13295, 66 Fed. Reg. 58343 (Nov. 16, 2001) ......................................17

Exec. Order No. 13405, 71 Fed. Reg. 35485 (June 16, 2006) .........................................2

Exec. Order No. 13581, 76 Fed. Reg. 44757 (July 24, 2011) .......................................14

Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 23, 2015) ....................................2, 12

Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017) ..........................................5

## **REGULATIONS**

83 Fed. Reg. 3012 (Jan. 22, 2018) .................................................................................5

83 Fed. Reg. 50949 (Oct. 10, 2018) ...............................................................................5

83 Fed. Reg. 46067 (Sept. 10, 2018) ............................................................................17

83 Fed. Reg. 56251 (Nov. 8, 2018) ..............................................................................13

## **OTHER AUTHORITIES**

Cong. Rec. Serv., Military Construction Fuding in the Event of a National Emergency ....................17

Con't of Nat'l Emergency With Respect to Iran,
    2016 WL 6518765 (Nov. 3, 2016) .............................................................................13

H.J. Res. 46, 116th Cong.,
    https://www.congress.gov/bill/116th-congress/house-joint-resolution/46
    ("Veto Message) ....................................................................................1, 9, 10, 22

House Armed Services Committee Hearing on Southern Border Defense Support (Jan. 29, 2019),
    https://armedservices.house.gov/2019/1/department-of-defense-s-support-to-the-
    southern-border ................................................................................................. 6, 7

Hr'g on DoD's Budget Posture, S. Armed Servs. Comm. (Mar. 14, 2019)...........................................8

Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities,
    1999 WL 258030 (Apr. 27, 1999)...........................................................................6, 7, 16

National Emergencies Act: Hearings Before the Subcommittee on Administrative Law and
    Governmental Relations, 94th Cong. 27 (March 6, 1975) ...................................................11

President Donald J. Trump's Border Security Victory (Feb. 15, 2019),
    https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-
    security-victory/ (Fact Sheet 1) .................................................................................................10

Presidential Memorandum,
    2018 WL 1633761 (Apr. 4, 2018) ...............................................................................................7

S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated
    Emergency Powers, 94th Cong., 2d Sess., The National Emergencies Act Source Book:
    Legislative History, Texts, and Other Documents (1976)................................. 11, 12, 14, 23

The Funds Available To Address The Nat'l Emergency At Our Border (Feb. 26, 2019),
    https://www.whitehouse.gov/briefings-statements/funds-available-address-national-
    emergency-border/ (Fact Sheed 2) .............................................................................................10

U.S. Border Patrol Mileage of Pedestrian and Vehicle Fencing by State,
    www.cbp.gov/document/stats/us-border-patrol-mileage-pedestrian-and-vehicle-
    fencing-state ...............................................................................................................................5

Wright, Miller & Cooper, Fed. Practice & Procedure, § 3531.4 (2d ed. 1984) .......................35

## INTRODUCTION

On February 15, 2019, the President issued a proclamation declaring that a national emergency exists at the southern border. *See* Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation). Because the southern border is "a major entry point for criminals, gang members, and illicit narcotics" as well as "large-scale unlawful migration," the President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* As the President recently explained, tens of thousands of aliens are apprehended along the southern border each month and thousands of pounds of illegal drugs are smuggled across the border each year while, at the same time, migrants have begun organizing into caravans that include large numbers of families and unaccompanied children from Central American countries. *See* Veto Message for H.J. Res. 46 (Mar. 15, 2019).

The Government has been building barriers along the southern border since the 1990s pursuant to congressional authorization. To address the current national emergency at the southern border, three statutory authorities and sources of funding have been identified to continue the construction of additional barriers, in addition to the $1.375 billion recently appropriated by Congress for such construction: (1) the Treasury Forfeiture Fund (31 U.S.C. § 9705); (2) the Department of Defense's (DoD) counter-drug support authority (10 U.S.C. § 284); and (3) the authority to reallocate funding from military construction projects, made available through the President's national emergency declaration (10 U.S.C. § 2808). Only the last source of statutory authority—§ 2808—depends on the President's national emergency declaration. The other two sources of authority—§§ 9705 and 284—are available regardless of the emergency at the southern border.

The Proclamation follows a forty-year tradition of multiple Presidents of both parties declaring national emergencies to address a wide range of problems. Indeed, many of the declarations

concerned situations that did not involve suddenly emerging threats or the sort of national crisis that currently exists on the southern border.   Thus, for example, President Obama declared a national emergency to address "political repression" in Burundi, Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 23, 2015), President George W. Bush declared a national emergency to address the "fundamentally undemocratic March 2006 elections" in Belarus, Exec. Order No. 13405, 71 Fed. Reg. 35485 (June 16, 2006), and President Clinton declared a national emergency because "the Government of Burma has committed large-scale repression of the democratic opposition in Burma," Exec. Order No. 13047, 62 Fed. Reg. 28301 (May 22, 1997).   And Presidents similarly have used this power to address longstanding problems, such as when George H.W. Bush declared a national emergency in 1990 to address the "proliferation of chemical and biological weapons" around the world.   Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990).   President Trump's Proclamation concerning the national emergency at our Nation's southern border is neither unprecedented nor fundamentally different from past uses of the same authority by his predecessors, and in fact is more closely tied to exigent circumstances.

Plaintiffs seek to challenge the Proclamation and Defendants' reliance on two statutory authorities in addressing the border crisis, but the Court lacks jurisdiction to do so, and the Complaint fails to state claims upon which relief may be granted.   As a threshold matter, judicial review of the Proclamation is not available under the National Emergencies Act (NEA), and in any event, such challenges raise political questions that courts are not equipped to answer, as courts overwhelmingly have recognized.   Moreover, independent separation-of-powers concerns require dismissal of the President as a defendant because there is no cause of action against the President and Plaintiffs may not obtain equitable relief directly against the President for his official conduct, particularly where, as here, relief could be provided by a subordinate agency official.   Plaintiffs also lack Article III standing because Defendants are not constructing any border barrier project at issue in the Complaint (either

2

on the individual Plaintiffs' property or in the Rio Grande Valley as a whole) pursuant to the President's Proclamation, § 2808, or § 284. And in any event, Plaintiffs' lack standing to challenge DoD's use of its § 2808 authority, as the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808.

Plaintiffs' nonstatutory ultra vires claims alleging that Defendants have acted in excess of their authority under § 2808 and § 284 also fail. In addition to the fact that Plaintiffs cannot obtain relief against the President, these claims should be dismissed because the Administrative Procedure Act (APA) provides a congressionally authorized cause of action to challenge agency decisionmaking here. Plaintiffs cannot evade the APA via the narrow doctrine of nonstatutory review of alleged ultra vires action. Even if Plaintiffs could rely on the ultra vires framework, this is not the exceptional case where nonstatutory review is available to address a violation of a clear and mandatory statutory requirement.

Finally, Plaintiffs' constitutional claims should be dismissed because they merely repackage claims of statutory violations in constitutional terms. Defendants are relying on express congressional authorization to fund border construction, not the President's independent Article II authority. Plaintiffs' effort to reframe alleged statutory violations as independent separation-of-powers violations contravenes the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

For these reasons, as explained further below, Plaintiffs' Complaint should be dismissed.

## BACKGROUND

I. **Congress's Express Authorization of Barrier Construction Along the U.S.-Mexico Border**

In 1990, the U.S. Border Patrol, with the assistance of the National Guard, began construction of a border fence near San Diego under the authority Congress granted to the Attorney General "to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5); *see D & D Landholdings v. United States*, 82 Fed. Cl. 329, 332 (2008). Since then,

3

Congress repeatedly has authorized the construction of border barrier infrastructure to prevent illegal entry of people and contraband.   In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which authorizes the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Pub. L. No. 104-208, Div. C., Title I § 102(a), 110 Stat. 3009 (Sept. 30, 1996), as amended (codified at 8 U.S.C. § 1103 note).

Since then, Congress has amended IIRIRA on three occasions to expand the Government's authority to construct barriers along the southern border.   In 2005, Congress passed the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306, which authorized the Secretary of Homeland Security "to waive all legal requirements" that, in the "Secretary's sole discretion," are "necessary to ensure expeditious construction" of barriers and roads.  *Id.* § 102(c)(1). Congress again amended IIRIRA as part of the Secure Fence Act of 2006, requiring construction of "physical barriers, roads, lights, cameras, and sensors" across hundreds of miles of the southern border in five specified locations, including in the Rio Grande Valley.  Pub. L. No. 109-367, § 3, 120 Stat. 2638 (2006).  In 2007, Congress expanded this requirement and directed "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border."   Dep't of Homeland Sec. Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (2007).

Relying on these authorities, the Department of Homeland Security (DHS) has installed 705 miles of vehicle and pedestrian barriers along the southern border since 1996.[1]  *See* U.S. Border Patrol

---

[1]      The Court may consider facts subject to judicial notice outside the complaint on a motion to dismiss without converting the motion into a motion for summary judgment. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  The Court may take judicial notice of the publicly available information on official government websites cited herein. *See Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 133, n.5 (D.D.C. 2019); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014).

Mileage of Pedestrian and Vehicle Fencing by State, www.cbp.gov/document/stats/us-border-patrol-mileage-pedestrian-and-vehicle-fencing-state.   DHS's efforts to construct border barriers under IIRIRA have been subject to a diverse array of legal challenges, but courts have uniformly dismissed every lawsuit.  *See, e.g.*, *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1215 (9th Cir. 2019); *N. Am. Butterfly Ass'n v. Nielsen*, 2019 WL 634596 (D.D.C. Feb. 14, 2019); *Save Our Heritage v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007).

**II.    DHS's Recent Efforts to Expedite Border Barrier Construction**

On January 25, 2017, the President issued an Executive Order directing federal agencies "to deploy all lawful means to secure the Nation's southern border."  Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017).  The Order stated that it is the policy of the Executive Branch to "secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism."  *Id.*  The Order required that agencies "take all appropriate steps to immediately plan, design and construct a physical wall along the southern border," including "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds" to that effort.  *Id.* at 8794.

In furtherance of these directives, DHS has worked to expedite construction of a variety of different border barrier projects over the past two years, including structures in the Rio Grande Valley. *See, e.g.*, Determination Pursuant to Section 102 of IIRIRA, as Amended, 83 Fed. Reg. 50949 (Oct. 10, 2018) (construction in Rio Grande Valley Sector of Texas); Determination Pursuant to Section 102 of IIRIRA, as Amended, 83 Fed. Reg. 3012 (Jan. 22, 2018) (construction in New Mexico).

**III.    Congress's Authorization for U.S. Military Support of DHS's Border Security Efforts**

Congress also has expressly authorized the U.S. military to provide a wide range of support to DHS at the southern border, including the "construction of roads and fences and installation of

lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284; *see id.* §§ 271-74. Since the early 1990s, military personnel have supported civilian law-enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to transnational organized crime and other transnational threats. *See H. Armed Servs. Comm. Hr'g on S. Border Defense Support* (Jan. 29, 2019) (Joint Statement of John Rood, Under Secretary of Defense for Policy, and Vice Admiral Michael Gilday, Dir. of Operations for the Joint Chiefs of Staff) (Joint Statement of Rood and Gilday), https://armedservices.house.gov/2019/1/department-of-defense-s-support-to-the-southern-border. Active, Reserve, and National Guard personnel have provided a wide range of assistance, including aerial reconnaissance, ground surveillance, search and rescue, engineering, communications, and medical support. *Id.*

Both Presidents Bush and Obama deployed military personnel to the southern border to support DHS's border security efforts. In 2006, President Bush directed DoD to provide between 3,000 and 6,000 National Guard personnel in support of CBP's Operation Jump Start. *Id.* Additionally, President Obama directed DoD to provide up to 1,200 National Guard personnel annually from 2010 to 2016 in support of CBP's Operation Phalanx. *Id.*

For decades, U.S. military forces have played an active role in barrier construction and reinforcement during their deployments to the southern border. Military personnel were critical to construction of the San Diego border barrier in the early 1990s as well as other border fence projects. *See* H.R. Rep. No. 103-200, at 330-31 (1993) (commending DoD for its role in construction of the San Diego primary fence); *Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities*, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey, Dir. of the Office of Nat'l Drug Control Policy) (since 1990 DoD and the California National Guard Counter Drug Directorate "have constructed over 55 miles of barrier fencing in urban areas and 10 miles of . . . barriers in rural settings."). In 2006, the National Guard improved the southern border security infrastructure by

building more than 38 miles of fence and 96 miles of vehicle barrier. *See* Joint Statement of Rood and Gilday. More recently, the U.S. Army Corps of Engineers has assisted DHS by providing planning, engineering, and barrier construction support. *See, e.g.*, *Gringo Pass, Inc. v. Kiewit Sw. Co.*, 2012 WL 12905166, at *1 (D. Ariz. Jan. 11, 2012).

## IV.   DoD's Current Support for DHS's Efforts to Secure the Southern Border

Building on this decades-long practice, on April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States." Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018). The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to the "anticipated rapid rise in illegal crossings," as well as "the combination of illegal drugs, dangerous gang activity, and extensive illegal immigration." *Id.* The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard to help secure our border and protect our homeland." *Id.* To address this crisis, the President directed the Secretary of Defense to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country." *Id.* The President also directed the Secretary of Defense to request the use of National Guard personnel to assist in fulfilling this mission. *Id.* Since April 2018, National Guard personnel have performed a range of administrative, logistical, and operational tasks in support of CBP's Operation Guardian Support. *See* Joint Statement of Rood and Gilday.

In October 2018, the President expanded the military's support to DHS to include active duty military personnel. *See id.* Since then, active duty personnel have provided a range of support to DHS, including aviation and engineering support, hardening U.S. ports of entry, erecting temporary barriers, and emplacing concertina wire. *See id.* As of mid-March 2019, approximately 4,000 active duty

personnel and 2,000 National Guard personnel were stationed at the southern border.  *See Hr'g on DoD's Budget Posture, S. Armed Servs. Comm.* (Mar. 14, 2019) (Test. of Gen. Joseph Dunford, Chairman of the Joint Chiefs of Staff).

## V.   The President's Proclamation Declaring a National Emergency at the Southern Border

On February 15, 2019, in accordance with requirements of the NEA, 50 U.S.C. § 1601 *et seq.*, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States."  *See* Proclamation.  The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency."  *Id.*  The President explained:

> The southern border is a major entry point for criminals, gang members, and illicit narcotics.  The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years.  In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending.  If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate.

*Id.*  The President noted that in response to his April 4, 2018 memorandum, DoD has provided support and resources to DHS at the southern border.  *Id.*  Despite these efforts, "because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis."  *Id.*

To achieve its purpose, the Proclamation invokes and makes available two statutory authorities to be exercised by DoD, as appropriate.  First, the Proclamation makes available the authority under 10 U.S.C. § 12302 to order units or members of the Ready Reserve to active duty.  *See id.*; 10 U.S.C. § 12302(a).  Second, the Proclamation makes available to the Acting Secretary of Defense the authority

under 10 U.S.C. § 2808, which provides that, "without regard to any other provision of law," the Secretary of Defense "may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces." *Id.* § 2808(a). The Proclamation directs the Secretaries of Defense, Interior, and Homeland Security to "take all appropriate actions, consistent with applicable law, to use or support the use of the authorities . . . invoked, including, if necessary, the transfer and acceptance of jurisdiction over border lands." *See* Proclamation.

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the President's national emergency declaration. *See* Veto Message. In doing so, the President relied upon statistics published by CBP as well as recent congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.* The President highlighted (1) the recent increase in the number of apprehensions along the southern border, including 76,000 CBP apprehensions in February 2019, the largest monthly total in the last five years; (2) CBP's seizure of more than 820,000 pounds of drugs in fiscal year 2018; and (3) arrests of 266,000 aliens previously charged with or convicted of crimes in fiscal years 2017 and 2018. *See id.* The President also emphasized that migration trends along the southern border have changed from primarily single adults from Mexico, who could be easily removed upon apprehension, to caravans that include record numbers of families and unaccompanied children from Central America. *See id.* The President explained that this shift requires frontline border enforcement personnel to divert resources away from border security to humanitarian efforts and medical care. *See id.* Further, the President stated that criminal organizations are taking advantage of the large flows of families and unaccompanied minors to conduct a range of illegal activity. *See id.* With new surges of migrants expected in the coming months, the President stated that border enforcement personnel and resources are strained "to the breaking point." *See id.* The President concluded that the "situation on our border

9

cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *See id.*

**VI.**   **The Use of Spending Authorities for Barrier Construction**

On the same day that the President issued the Proclamation, the White House publicly released a fact sheet setting forth the sources of funding that are to be used to construct additional barriers along the southern border.  In addition to the $1.375 billion appropriation in the Fiscal Year 2019 Consolidated Appropriations Act for barrier construction in the Rio Grande Valley area of Texas, *see* Pub. L. No. 116-6, § 230, 133 Stat. 13 (2019), the fact sheet identifies the following additional sources of funding for potential barrier construction, which it explains will be used sequentially and as needed:

- About $601 million from the Treasury Forfeiture Fund;

- Up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (10 U.S.C. § 284);

- Up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (10 U.S.C. § 2808).

*See President Donald J. Trump's Border Security Victory* (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/ (Fact Sheet 1); *see also The Funds Available To Address The Nat'l Emergency At Our Border* (Feb. 26, 2019), https://www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-border/ (Fact Sheet 2).

**STATUTORY FRAMEWORK**

**I.**   **National Emergencies Act**

The NEA, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651), was an effort by Congress to "establish procedural guidelines for the handling of future

emergencies with provision for regular Congressional review." S. Rep. No. 94-922 (1976).[2] Title II of the NEA—codified at 50 U.S.C. § 1621—prescribes rules for the declaration of national emergencies by the President. Section 1621(a) authorizes the President to "declare [a] national emergency" with respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Section 1621(b) states that "[a]ny provisions of law conferring powers and authorities to be exercised during a national emergency shall be effective and remain in effect (1) only when the President (in accordance with subsection (a) of this section), specifically declares a national emergency, and (2) only in accordance with [the NEA]." *Id.* § 1621(b).

Congress did not define the term "national emergency" or place any conditions on the President's ability to declare a national emergency. Instead, Congress intentionally left this determination to the President. As the co-chairmen of the Special Congressional Committee on National Emergencies that studied the issue and drafted the NEA explained, "[W]e did review this possibility of defining what national emergencies might be comprehended; and we decided you would cause more trouble by trying to define it than just saying 'national emergency' . . . We felt it would be wrong to try to circumscribe with words with what conditions a President might be confronted." *National Emergencies Act: Hearings Before the Subcommittee on Administrative Law and Governmental Relations*, 94th Cong. 27 (March 6, 1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers.");

---

[2]      The NEA was the culmination of a multi-year effort by Congress to examine the field of emergency statutes and procedures. *See* S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated Emergency Powers, 94th Cong., 2d Sess., The National Emergencies Act Source Book: Legislative History, Texts, and Other Documents, at 3–9 (1976) (summarizing legislative history of NEA from 1972-1976 led by the Senate Special Committee on National Emergencies) (hereinafter "The National Emergencies Act Source Book").

*see id.* at 27 (statement of Sen. Church) ("[O]nce we got into that thicket [of defining a national emergency] it became evident that we would be creating more problems than we would be solving."). And during the final debate on the NEA, the House of Representatives specifically rejected an amendment that would have limited the circumstances in which the President could declare a national emergency only to times of war or attacks upon the United States. *See* The National Emergencies Act Source Book at 278–80; *see id.* at 280 (statement of Rep. Moorhead) ("[T]his amendment would completely take away from the President the flexibility of acting in times of crisis or an emergency" and "it is important that we give our President some flexibility from time to time."). At the time of its passage, Congress therefore expressly recognized that the NEA "makes no attempt to define when a declaration of national emergency is proper." *Id.* at 9 (quoting S. Rep. No. 94-1168).

The NEA was "an effort by the Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes." *See* S. Rep. No. 94-1168, 3 (1976). Accordingly, the NEA provides that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631. The NEA thus establishes procedural guidelines for the President to follow before he may invoke other statutory authorities.

In the more than 40 years since Congress enacted the NEA, Presidents have exercised broad discretion in determining what challenges amount to national emergencies, declaring nearly 60 national emergencies addressing a wide variety of national and international challenges. For example, prior national emergency declarations have authorized the invocation of statutory powers to restrict the trade in uncut diamonds used to fund Sierra Leone's civil war, Exec. Order No. 13194, 66 Fed. Reg. 7389 (Jan. 18, 2001), to address the spread of swine flu in the United States, Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009), and to promote democracy or conflict resolution in various countries

around the world, *see, e.g.*, Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 22, 2015) (President Obama declared a national emergency to address the "violence against civilians" and "political repression" in Burundi).

The NEA also authorizes the President to renew declared emergencies annually without limitation. *See* 50 U.S.C. § 1622(d). Thirty-one national emergencies remain in effect today, with many having been renewed by multiple Presidents over several decades. For example, President Clinton declared a national emergency in 1996 after Cuban military aircraft intercepted and destroyed two unarmed U.S.-registered civilian aircraft in international airspace north of Cuba. *See* Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996). The emergency remains in effect today, having been renewed over the course of 23 years by Presidents Bush, Obama, and Trump, even though President Obama concluded in 2016 that "the descriptions of the national emergency set forth in Proclamations 6867 and 7757 no longer reflect the international relations of the United States related to Cuba." *See* Proc. No. 9398, 81 Fed. Reg. 9737 (Feb. 24, 2016). Indeed, the first national emergency declared under the NEA—President Carter's 1979 declaration responding to the Iran hostage crisis—has been in effect for 39 years and is now being continued because the United States' "relations with Iran have not yet normalized, and the process of implementing the agreements with Iran, dated January 19, 1981, is ongoing." *See* Con't of Nat'l Emergency With Respect to Iran, 2016 WL 6518765 (Nov. 3, 2016) (Letter from President Obama); 83 Fed. Reg. 56251 (Nov. 8, 2018) (renewal by President Trump).

Nothing in the NEA requires that a national emergency be a sudden or unforeseen event, as some emergencies build through an accretion of events and exist over a considerable period of time. In 1990, for example, President George H. W. Bush declared a national emergency arising from the "proliferation of chemical and biological weapons" around the world. Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990). Four years later, President Clinton added nuclear weapons proliferation to that emergency declaration. Exec. Order No. 12938, 59 Fed. Reg. 58099 (Nov. 14,

1994).  President Clinton also declared a national emergency arising from narcotics trafficking centered in Colombia, Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995), and President Obama declared a national emergency arising from the activities of certain transnational criminal organizations, Exec. Order No. 13581, 76 Fed. Reg. 44757 (July 24, 2011).  These declarations, like the President's Proclamation, addressed long-standing policy challenges confronting the United States, even though they were neither new nor unforeseen at the time they were declared to be a national emergency.  Indeed, the President's Proclamation acknowledged that the situation at the southern border is a "long-standing" problem and builds on previous efforts of President Obama to use emergency powers to address the threats along the southern border by declaring a national emergency targeting a Mexican cartel known as Los Zetas.  *See id.*

Recognizing that, by their very nature, declarations of national emergency require the need for flexibility in policy choices that are the province of the political branches of the federal government, Congress gave itself the exclusive authority to exercise oversight of a President's national emergency declaration.  As a remedy to potential overreach, Congress has authority to terminate a national emergency by enacting into law "a joint resolution."  50 U.S.C. § 1622(a)(1).[3]  Emphasizing the political judgment that Congress must make, the NEA expressly requires Congress to meet "[n]ot later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, . . . to consider a vote on a joint resolution to

---

[3]      The original draft of the NEA would have automatically terminated a national emergency after six months unless extended by an act of Congress.  *See* National Emergencies Act Source Book at 7. Congress eliminated this provision during debate and replaced it with the requirement that Congress pass a "concurrent resolution" to terminate a national emergency.  *See id.*; *Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 4 (1st Cir. 1987).  In 1985, Congress amended this provision and replaced the "concurrent resolution" requirement with one that calls for termination of a national emergency by "joint resolution."  Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985).  This amendment was the result of the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919, 959 (1983), which invalidated a similar provision as an unconstitutional legislative veto because it allowed Congress to act without the President's signature on legislation. *See United States v. Amirnazmi*, 645 F.3d 564, 581 n.26 (3d Cir. 2011).

determine whether that emergency shall be terminated." *Id.* § 1622(b); *see also id.* § 1622(c) (establishing procedure for both Houses of Congress to vote on a joint resolution terminating a national emergency). Additionally, Congress has imposed extensive reporting requirements on the Executive Branch when the President declares a national emergency. *See id.* § 1641(a)-(b) (requiring the President and each executive agency to maintain a file and index of, and transmit to Congress, certain orders, rules, and regulations); *id.* § 1641(c) (requiring the President to periodically transmit to Congress "a report on the total expenditures incurred by the United States Government . . . which are directly attributable to the exercise of powers and authorities conferred by such declaration"). The NEA does not provide any role for the courts in reviewing a national emergency declaration, as it does not create a private right of action or contain a civil enforcement mechanism.

## II.    <u>10 U.S.C. § 284</u>

10 U.S.C. § 284 states that "[t]he Secretary of Defense may provide support for the counterdrug activities . . . of any other department or agency of the Federal Government," if requested by the relevant "official who has responsibility for [such] counterdrug activities." 10 U.S.C. § 284(a), (a)(1)(A). This support includes express authority for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). This authority may be invoked at any time and does not require a declaration of national emergency.

Congress first provided DoD this authority in the National Defense Authorization Act for Fiscal Year 1991. Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1991). As a specific fiscal year appropriation, § 1004 had to be periodically renewed to continue DoD's authority to support counter-drug activities. *See, e.g.*, Pub. L. No. 107-107, § 1004, 115 Stat. 1012 (2001). Not only did Congress regularly renew § 1004, it frequently praised DoD's involvement in building barrier fences along the southern border and allocated additional funds to DoD to encourage its support of counter-drug

construction projects.  For example, in 1993, Congress "commend[ed]" DoD's efforts to reinforce

the border fence along a 14-mile drug-smuggling corridor in the San Diego-Tijuana border area, calling

the project "precisely the kind of federal-local cooperative effort the Congress had in mind in enacting

section 1004."  H.R. Rep. No. 103-200, at 330-331, 1993 WL 298896 (1993).  Government officials

and Congress alike have noted the particular importance of DoD's involvement in southern border

enhancement projects to prevent drug smuggling.  *See Hr'g Before the S. Comm. on Armed Servs. Subcomm.*

*on Emerging Threats and Capabilities*, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey, Dir.

of the Office of Nat'l Drug Control Policy) (testifying about the "vital contributions" made by DoD

to construct barrier fencing along the southern border); *see, e.g.*, H.R. Rep. No. 110-652, 420 (2008)

(recommending a $5 million increase to DoD's funding to continue construction of a southern border

fence, which was described as an "invaluable counter-narcotics resource").  In light of the continuing

"threat posed by the production and trafficking of heroin, fentanyl . . . , and other illicit drugs" across

our nation's borders, Congress permanently codified § 1004 at 10 U.S.C. § 284 in December 2016,

directing DoD "to ensure appropriate resources are allocated to efforts to combat this threat."  H.R.

Rep. No. 114-840, 1146 (2016).

### III.   <u>10 U.S.C. § 2808</u>

First enacted as part of the 1982 Military Construction Authorization Act, Pub. L. No. 97-99,

§ 903, 95 Stat. 1359 (1981), and later amended by the Military Construction Codification Act of 1982,

Pub. L. No. 97-214, § 2, 96 Stat. 153 (codifying 10 U.S.C. §§ 2801-08), 10 U.S.C. § 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national
> emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.)
> that requires use of the armed forces, the Secretary of Defense, without regard to any
> other provision of law, may undertake military construction projects, and may
> authorize the Secretaries of the military departments to undertake military construction
> projects, not otherwise authorized by law that are necessary to support such use of the
> armed forces.  Such projects may be undertaken only within the total amount of funds
> that have been appropriated for military construction, including funds appropriated
> for family housing, that have not been obligated.

In enacting this provision, Congress recognized that "it is impossible to provide in advance for all conceivable emergency situations" and wanted to fill "a gap [that] now exists with respect to restructuring construction priorities in the event of a declaration of war or national emergency." H.R. Rep. No. 97-44, at 72 (1981).

The term "military construction" as used in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road (as described in section 210 of title 23)." 10 U.S.C. § 2801(a). Congress in turn defined the term "military installation" to mean "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control." *Id.* § 2801(c)(4).

Presidents have invoked the military construction authority under § 2808 on two prior occasions. First, President George H.W. Bush authorized the use of § 2808 in 1990 following the Government of Iraq's invasion of Kuwait. *See* Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990); Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990). Second, President George W. Bush invoked § 2808 in response to the terrorist attacks against the United States on September 11, 2001. *See* Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001); Exec. Order No. 13295, 66 Fed. Reg. 58343 (Nov. 16, 2001). The national emergency declaration stemming from the terrorist attacks of September 11, 2001, remains in effect today, *see* 83 Fed. Reg. 46067 (Sept. 10, 2018), and DoD has used its § 2808 authority to build a wide variety of military construction projects, both domestically and abroad, over the past 17 years, *see* Cong. Research Serv., Military Construction Funding in the Event of a National Emergency at 1–3 & tbl. 1 (updated Jan. 11, 2019) (listing projects worth $1.4 billion performed domestically and abroad using § 2808 between 2001 and 2014).

17

## PLAINTIFFS' CLAIMS

On the same day the President issued the Proclamation, Plaintiffs filed the instant action. Pls.'
Compl., ECF No. 1. Plaintiffs include three individuals who reside in Starr County, Texas, along the
border with Mexico in the Rio Grande Valley. *Id.* ¶¶ 5, 8, 11. The individual Plaintiffs allege that they
reside on property that is adjacent to a tract of land bordering the Rio Grande River, and Plaintiff
Leonel Alvarez and Plaintiff Gaytan further allege to have ownership interests in the tract. *Id.*
Plaintiffs claim that, pursuant to the President's Proclamation, § 2808, and § 284, *id.* ¶¶ 1-2, the
Government intends to construct a "border wall" on the tract in question as "part of an approximately
150-foot wide enforcement zone that will include a 25-foot wide maintenance road" (the planned
project), *see id.* ¶ 7; *see also* ¶¶ 10, 13. The individual Plaintiffs claim that the eventual construction of
the planned project will negatively affect the "use and enjoyment of" their property, "threaten[]" to
damage to their homes during construction, and invade their "privacy and the quiet enjoyment of
[their] land." *Id.* ¶¶ 7, 10, 13.

Plaintiffs also include Frontera Audubon Society, a nonprofit organization headquartered in
Hidalgo County, Texas. *See id.* ¶ 14. The organizational Plaintiff alleges that it "is dedicated to
preserving wildlife and the native habitat of the Rio Grande Valley," *id.*, and includes as members
"avid birdwatchers and nature enthusiasts" who visit "a wildlife corridor along the last 250 miles of
the Rio Grande River" to observe birds and other wildlife, *id.* ¶ 16. It alleges that construction of a
barrier in the Rio Grande Valley will harm its members by cutting off access to areas south of the
barrier and curtailing their ability to "birdwatch and experience nature along the river." *Id.* ¶ 18.

Plaintiffs' Complaint alleges that the President's Proclamation and his "direction" to transfer
funds under §§ 2808 and 284 to construct a border barrier in the Rio Grande Valley, and specifically
the planned project, were ultra vires and violated the separation-of-powers doctrine. *Id.*, 1st-3rd
Causes of Action. They also allege the Acting Secretary of Defense's use of his authority under §§

18

2808 and 284 to construct border barriers was ultra vires.  *Id.*, 4th-5th Causes of Action.  Plaintiffs seek a declaration that the President and Acting Secretary of Defense have acted unlawfully, as well as an injunction prohibiting the Acting Secretary from taking action to construct border barriers, and specifically the planned project, using funds under §§ 2808 and 284.  *Id.*, Prayer for Relief.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of any claim over which a court lacks subject-matter jurisdiction.  The complaining party has the burden of establishing the predicates to federal jurisdiction, including standing.  *See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).  In the absence of standing, a matter is not justiciable.  Nor does a "justiciable 'controversy' exist[] when parties seek adjudication of a political question."  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (en banc) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007)).  Although in evaluating Rule 12(b)(1) motions, the court must accept well-pleaded factual allegations as true, "the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Federal Rule of Civil Procedure 12(b)(6) mandates dismissal for failure to state a claim upon which relief can be granted.  To pass muster, a complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" warrants dismissal.  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Although a court must accept as true well-pleaded factual allegations and construe them in the light most favorable to the plaintiff, it need not accept "legal conclusions" or "mere conclusory statements."  *Id.*  Neither is a court required to accept as true a complaint's factual allegations if they "contradict exhibits to the complaint or matters subject to judicial notice."  *Kaempe v. Myers*, 367 F.3d 958, 963

(D.C. Cir. 2004).  In addition to the facts alleged in the complaint, a court may consider "documents attached as exhibits or incorporated by reference in the complaint or documents upon which the plaintiff's complaint necessarily relies." *Cause of Action Inst. v. Eggleston*, 224 F. Supp. 3d 63, 70 (D.D.C. 2016) (internal citation omitted).

## ARGUMENT

### I.    The Court Lacks Jurisdiction.

Plaintiffs' Complaint suffers from jurisdictional defects.  *First*, Plaintiffs' challenge to the President's decision to issue the Proclamation is nonjusticiable, both because the NEA impliedly precludes judicial review and because the declaration of a national emergency raises a political question courts are not equipped to answer.  Furthermore, the President must be dismissed as a party because there is no cause of action against the President and Plaintiffs cannot obtain injunctive or declaratory relief against the President.  *Second*, Plaintiffs do not have standing to maintain this suit because the authorities they challenge are not being used to construct the barrier projects at issue.  In any event, Plaintiffs lack standing to bring a claim pursuant to § 2808 because the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under that authority. Accordingly, the Court should dismiss Plaintiffs' claims under Rule 12(b)(1).

### A.    Plaintiffs' Challenge to the President's Declaration of a National Emergency Should Be Dismissed.

This Court lacks subject-matter jurisdiction over Plaintiffs' allegations concerning the NEA and the President's Proclamation.  Congress has placed no limitations on the President's authority to declare a national emergency.  Because the NEA does not define the term "national emergency," the text and structure of the statute evidence Congress's choice to leave this determination to the President, subject only to congressional oversight as provided by the NEA.   Whether viewed as a statutory or separation-of-powers matter, the President is entitled to make a determination about what circumstances are a national emergency in the political process without judicial second guessing.

1. <u>The NEA Evidences Congress's Intent to Preclude Judicial Review.</u>

The Supreme Court has instructed that in determining whether a statute "precludes judicial review," a court must examine the "express text of the statute" as well as "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). That Congress intended to preclude judicial review need only be "fairly discernible" from the evidence. *Id.* at 350–51.

Here, Congress's intent to preclude judicial review is evidenced by the text of the NEA, which does not define the term national emergency or provide courts with any standards by which to evaluate the President's exercise of this authority. *See* 50 U.S.C. § 1621. The lack of a definition in the statute reflects Congress's intentional decision to leave to the President the determination about when and under what circumstances to declare a national emergency. The absence of any judicially enforceable remedy is further supported by the fact that the NEA establishes only procedural and reporting guidelines that the President must follow when he invokes other statutory authorities conditioned on a declaration of a national emergency. *See* 50 U.S.C. §§ 1631, 1641. Accordingly, the NEA does not provide a mechanism for litigants to have any role in the statutory process, let alone a role that Plaintiffs could enforce in court. *See Amirnazmi*, 645 F.3d at 581 (stating that the "NEA places the onus on Congress to ensure emergency situations remain anomalous").

The lack of a judicial enforcement mechanism to challenge a national emergency declaration is reinforced by the NEA's exclusive remedial scheme for Congress to challenge through political means the President's determination that a particular national emergency exists. *See* 50 U.S.C. § 1622; *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate."). As explained above, Congress has the authority to terminate a national emergency by enacting into law "a joint resolution." 50 U.S.C. § 1622(a)(1).

Further, the NEA expressly requires Congress to vote on whether to terminate the declared emergency within six months of the President's declaration and establishes expedited procedures for Congress to vote on such a measure once a termination resolution is introduced. *Id.* § 1622(b), (c). Here, majorities of both houses of Congress attempted to terminate the President's national emergency declaration by passing a joint resolution, but the President vetoed that measure and there was insufficient support for termination among members of Congress to override the President's veto in order to enact the joint resolution into law. *See* Summary, H.J. Res. 46, 116th Cong., https://www.congress.gov/bill/116th-congress/house-joint-resolution/46. The fact that there was insufficient Congressional will to exercise its ability to terminate the Proclamation through the NEA's statutory procedures only underscores that this dispute should not be adjudicated by the Court. *Cf. Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015) ("Having failed to prevail in their own Houses, the suitors could not repair to the Judiciary to complain.").

Moreover, when Congress had the opportunity to change the oversight structure of the NEA in response to the Supreme Court's *Chadha* decision that declared the "legislative veto" unconstitutional, Congress notably changed the termination threshold from a "concurrent resolution," which does not involve Presidential approval, to a "joint resolution," which requires either Presidential approval or adequate Congressional support to override a Presidential veto in order to be enacted.[4] Congress could have instituted a different mechanism, such as creating a judicial-enforcement regime, but Congress did not adopt other alternatives. *See Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 4 (1st Cir. 1987) (Breyer, J.) ("This legislative history makes clear that Congress intended to impose upon itself the burden of acting affirmatively to end an emergency."). Instead, Congress gave itself the power to

---

[4] The NEA's "provision for termination by concurrent resolution is unconstitutional because, unlike a joint resolution, termination by concurrent resolution would enable Congress to take legislative action without presenting the action to the President for his signature." *Beacon Prods. Corp.*, 633 F. Supp. at 1196; *see supra* note 3.

oversee the President's use of statutory emergency authority, and there is no basis for the Court to create a new judicial remedy on top of Congress's carefully crafted framework. Where, as here, the statute expressly provides Congress with authority to terminate a national emergency, it is "an 'elemental canon' of statutory construction that . . . courts must be especially reluctant to provide additional remedies." *Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 533 (1989) (citations omitted).

Further, the NEA was the product of a multi-year study by Congress to address the field of national emergency authorities, and nothing in that extensive legislative history suggests that Congress intended to allow judicial challenges to the President's national emergency declarations. To the contrary, the legislative history shows that Congress, not the courts, would be the branch of government to oversee the President's use of his emergency powers. *See* The National Emergencies Act Source Book at 338 ("every type and class of presidentially declared emergency will be subjected to congressional control" and "the legislative branch will be in a position to assert its ultimate authority"); *see also Block*, 467 U.S. at 349 (preclusion of judicial review may be implied from "specific legislative history" alone). Moreover, given the President's "unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982), any remedial scheme where litigants could sue the President to challenge a national emergency declaration would raise separation-of-powers concerns and create tension with the Supreme Court's admonition that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501 (1866). There is no indication in the legislative history that Congress gave consideration to those weighty issues or concluded that such lawsuits against the President should proceed. *See* The National Emergencies Act Source Book at 342 (stating that "there is [no] intent here to limit either the President's power or flexibility to declare a national emergency" and there is no intent to limit "the subject matter of the emergency or the timing of its declaration") (statements of

23

Reps. Moorhead and Flowers).  In the absence of clear direction from Congress, the Court should not imply a remedy that would conflict with longstanding separation-of-powers principles.

In light of the NEA's text, structure, and legislative history, Congress has precluded judicial review of the President's national emergency Proclamation.

2. Plaintiffs' Challenge to the President's National Emergency Declaration Presents a Nonjusticiable Political Question.

Courts that have considered the issue have uniformly concluded that a Presidential declaration of a national emergency is a nonjusticiable political question.  *See, e.g.*, *Amirnazmi*, 645 F.3d at 581 ("[F]ederal courts have historically declined to review the essentially political questions surrounding the declaration or continuance of a national emergency.") (citation omitted); *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1081 (9th Cir. 1982) ("[W]e will not address these essentially-political questions.").[5]  Since passage of the NEA in 1976, there have been nearly 60 national

---

[5]     *See also Soudavar v. Bush*, 46 F. App'x 731 (5th Cir. 2002) (per curiam) (affirming district court decision dismissing a challenge to executive orders imposing national emergency sanctions on Iran as involving a "nonjusticiable political question"); *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 573 (Cust. & Pat. App. 1975) (courts will not "review the judgment of a President that a national emergency exists"); *Chichakli v. Szubin*, 2007 WL 9711515, at *4 (N.D. Tex. June 4, 2007) (holding that a challenge to President Bush's declaration of a national emergency with respect to the "unstable situation" in Liberia "presents a nonjusticiable political question"), *aff'd in part, vacated in part*, 546 F.3d 315 (5th Cir. 2008); *Beacon Prods. Corp.*, 633 F. Supp. at 1194–95 (whether national emergency existed with respect to Nicaragua presents a non-justiciable political question); *Sardino v. Fed. Reserve Bank of N.Y.*, 361 F.2d 106, 109 (2d Cir. 1966) (concluding that President Truman's national emergency declaration concerning the situation in Korea is not justiciable and "courts will not review a determination so peculiarly within the province of the chief executive"); *Veterans & Reservists for Peace in Vietnam v. Regional Comm'r of Customs, Region II*, 459 F.2d 676, 679 (3d Cir. 1972) ("a President's declaration of national emergency is unreviewable"); *Santiago v. Rumsfeld*, 2004 WL 3008724, at *3 (D. Or. Dec. 29, 2004) (holding that plaintiffs challenge to "whether the national emergency declared by the President continues to apply to Afghanistan" has "raised an essentially political issue" and "[c]ourts should refrain from ruling on such issues"), *aff'd* 403 F.3d 702 (9th Cir. 2005 and 407 F.3d 1018 (9th Cir. 2005); *United States v. Groos*, 616 F. Supp. 2d 777, 788-89 (N.D. Ill. 2008) ("The court cannot question the President's political decision" to declare a national emergency regarding "unrestricted access of foreign parties to U.S. goods and technology"); *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988) ("to the extent that the plaintiffs' inquiry into the 'true facts' of the Libyan crisis would seek to examine the President's motives and justifications for declaring a national emergency, such an inquiry would likely present a nonjusticiable political question.").

emergencies declared by seven different Presidents, and even in the few instances where the declarations have been challenged, *see supra* note 5, no court has ever reviewed the merits.[6]  Plaintiffs' request for this Court to take that unprecedented step is without merit and this Court should not depart from this long line of unbroken authority.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  Both the separation-of-powers doctrine and the policy of judicial self-restraint require that federal courts refrain from intrusion into areas committed by the Constitution to the Legislative and Executive Branches of the Government.  *See Baker v. Carr*, 369 U.S. 186, 217 (1962).  The *Baker* Court set forth the factors that a court is to consider in determining whether a particular claim raises nonjusticiable political questions:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a [C]ourt's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

---

[6]     Past practice also belies Plaintiffs' suggestion that this national emergency declaration is both justiciable and invalid because the President stated that he "didn't need" to issue the declaration and "could do the wall over a longer period of time."  *See* Pls.' Compl. ¶ 31.  A national emergency declaration necessarily reflects an exercise of discretion, and Presidents have often chosen to declare national emergencies to address circumstances that were neither new nor unforeseen at the time the declaration issued.  *See supra* at 13-14.  No court has ever conducted the type of judicial second guessing that Plaintiffs propose here by evaluating whether an emergency could have been addressed without relying on emergency statutory authorities.

*Id.* at 217.  The existence of any one of these factors indicates the existence of a political question.  *Id.* Here, Plaintiffs' assertion that the situation along the southern border does not constitute a national emergency runs afoul of most, if not all, of these factors.

First, there are no judicially manageable standards to ascertain whether or when to declare a national emergency.  As explained above, Congress intentionally chose not to define the term "national emergency" and left that determination to the President, subject only to oversight from Congress.  *See supra* at 11-12.  The NEA sets forth no criteria from which the Court could judge the President's action or make a determination about whether a particular issue constitutes a national emergency.  *See Spawr Optical Research,* 685 F.2d at 1080 ("The statute contained no standards by which to determine whether a national emergency existed or continued.").  Plaintiffs ask the Court to take the remarkable step of supplanting the President's determination with the "courts' own unmoored determination of what United States policy toward [the southern border] should be."  *Zivotofsky ex rel. Zivotofsky v. Clinton,* 566 U.S. 189, 196 (2012).  The Court could not decide this question "without first fashioning out of whole cloth some standard for when" a national emergency "is justified."  *El-Shifa Pharm. Indus. Co.,* 607 F.3d at 845.  To grant Plaintiffs' requested relief, the Court would have to make, with no judicially manageable standards to guide it, numerous political judgments about how the current humanitarian and security crisis at the border impacts immigration policy, foreign relations, public safety, and national security.  "The judiciary lacks the capacity for such a task."  *Id.*

Second, any such determinations would require precisely the sort of "policy determination of a kind clearly for nonjudicial discretion" that the Supreme Court has indicated is a hallmark of a political question.  *Baker*, 369 U.S. at 217.  As the Supreme Court has long recognized, illegal immigration creates "significant economic and social problems" in the United States. *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975); *see also Plyler v. Doe,* 457 U.S. 202, 237 (1982) (Powell, J., concurring) (recognizing illegal immigration to be "a problem of serious national proportions").  More

26

recently, in *Arizona v. United States,* 567 U.S. 387 (2012), the Court emphasized that the problems posed by illegal immigration "must not be underestimated" and credited evidence in the record of various problems "associated with the influx of illegal migration across private land near the Mexican border," including "an epidemic of crime" and "safety risks." *Id.* at 397–98 (citation omitted).

The President has chosen to confront these and other challenges traceable to the current crisis at the border by declaring a national emergency and invoking the express powers delegated to him by Congress. *See* Proclamation. Under these circumstances, the Court cannot review the matter without second-guessing the President's policy determinations. Decisions "about how best to enforce the nation's immigration laws in order to minimize the number of illegal aliens crossing our borders patently involve policy judgments about resource allocation and enforcement methods." *New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996). These "issues fall squarely within a substantive area clearly committed by the Constitution to the political branches; they are by their nature peculiarly appropriate to resolution by the political branches of government both because there are no judicially discoverable and manageable standards for resolving them." *Id.*; *Sadowski v. Bush*, 293 F. Supp. 2d 15, 19 (D.D.C. 2003) ("deciding how to best enforce existing immigration laws and policies and how to keep out illegal immigrants requires making policy judgments that are suited for nonjudicial discretion"). Accordingly, the President's Proclamation is not reviewable in this case.

Third, the type of policy decisions that Plaintiffs ask this Court to make are entrusted to the political branches, not the courts. "[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of the government." *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972). As the Supreme Court has explained:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a

27

> wide variety of classifications must be defined in the light of changing political
> and economic circumstances, such decisions are frequently of a character more
> appropriate to either the Legislature or the Executive than to the Judiciary.

*Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (footnote omitted); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977)

("Our cases have long recognized the power to expel or exclude aliens as a fundamental sovereign

attribute exercised by the Government's political departments largely immune from judicial control.").

Moreover, "[t]he political branches are far better equipped (and more accountable to the people) for

making the types of decisions that arise in the military setting," and "[j]udges have long respected this

allocation of powers." *Doe 2 v. Shanahan*, 2019 WL 1086495, at *21 (D.C. Cir. Mar. 8, 2019) (Williams,

J., concurring). The President's decision to declare a national emergency is a quintessential policy

decision in an area reserved to the political branches involving matters of immigration, foreign

relations, use of military forces, and national security. *See, e.g.*, *United States v. Delgado-Garcia*, 374 F.3d

1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-control policies are of crucial importance to the

national security and foreign policy of the United States."); *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d

119, 129 (D.D.C. 2007) (construction of border barriers "pertains to both foreign affairs and

immigration control—areas over which the Executive Branch traditionally exercises independent

constitutional authority"). There is no basis for the Court to substitute its judgment for that of the

President on these sensitive policy issues that are nonjusticiable political questions.

      3.    <u>The President Should Be Dismissed as a Party to this Lawsuit Because There is No Cause of Action Against the President and Plaintiffs Cannot Obtain Equitable Relief Against the President.</u>

      Plaintiffs' claims against the President suffer from separate and independent problems: there

is no cause of action against the President, and Plaintiffs may not obtain—and the Court may not

order—equitable relief directly against the President for his official conduct.

      Plaintiffs lack a cause of action to sue the President. The actions of the President are not

reviewable under the APA, *see Dalton*, 511 U.S. at 479, and likewise there is no implied equitable cause

of action to do so.  Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 319 (1999).  Here, there is no tradition of equitable relief against the President.  To the contrary, the Supreme Court recognized over 150 years ago in *Mississippi*, 71 U.S. (4 Wall.) at 501, that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties," a principle the Court reaffirmed more recently in *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *id.* at 827 (Scalia, J., concurring in part and concurring in the judgment) ("apparently unbroken historical tradition supports the view" that courts may not order the President to "perform particular executive . . . acts").

Moreover, the Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress.  *See Nixon*, 457 U.S. at 748 n.27 (declining to assume that *Bivens* and other implied statutory damages "cause[s] of action run[] against the President of the United States"); *Franklin*, 505 U.S. at 801 (declining to find cause of action against the President under the APA "[o]ut of respect for the separation of powers and the unique constitutional position of the President").  Accordingly, in the absence of an express statutory cause of action against the President or a tradition of recognizing such suits as a matter of equity, there is no basis for the Court to infer equitable relief against the President.  "The reasons why courts should be hesitant to grant such relief are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers.  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).  Moreover, the Supreme Court has taken a "traditionally cautious approach to equitable powers, which leaves any substantial expansion of past practice to Congress."  *Grupo Mexicano*, 527 U.S. at 329.  Any expansion of an equitable remedy against the President here would create separation-of-powers problems by usurping "the role of Congress in

determining the nature and extent of federal-court jurisdiction under Article III." *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017).

Lower courts have followed the logic of *Franklin* and *Massachusetts* by dismissing the President as a defendant in civil cases and declining to impose either declaratory or injunctive relief against him in his official capacity. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) ("In light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction against the President himself."); *vacated and remanded*, 138 S. Ct. 353 (2017); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated as moot*, 138 S. Ct. 377 (2017) ("the extraordinary remedy of enjoining the President is not appropriate here"); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief . . . ."); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President himself as a party to this case").

In any event, assuming they have standing, Plaintiffs could potentially obtain the relief they seek against the agency defendant because the gravamen of Plaintiffs' Complaint is that DoD, not the President, will construct or fund border barriers in excess of its statutory authorities. Accordingly, in addition to the reasons explained above, the President should be dismissed as a party in order to avoid an unnecessary separation-of-powers conflict.[7] *See Swan*, 100 F.3d at 978 ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by

---

[7] It is appropriate to dismiss the President even before resolving Article III standing, for two reasons. First, the Supreme Court has repeatedly described the bar against suing the President for his official duties as jurisdictional in nature. *See Franklin*, 505 U.S. at 802-03 (quoting *Mississippi*, 71 U.S. (4 Wall) at 501). Second, even if not technically jurisdictional, it is the sort of categorical threshold defense that can be resolved prior to jurisdiction. *See Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005). At a minimum, the relief against the President should be dismissed for failure to state a claim.

injunctive relief against subordinate officials.").[8]

## B.   **Plaintiffs Have Not Alleged Article III Standing.**

### 1.   Plaintiffs do not satisfy the traceability and redressability prongs of Article III's standing requirement.

Plaintiffs also fail to plead allegations sufficient to satisfy Article III's standing requirement. Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies.  U.S. Const. art. III, § 2, cl. 1.  This prerequisite reflects the "common understanding of what it takes to make a justiciable case."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).  Consequently, "a showing of standing 'is an essential and unchanging' predicate to any exercise of [a court's] jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Put slightly differently, "Article III standing must be resolved as threshold matter."  *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004) (citing *Steel Co.*, 523 U.S. at 96-102).  As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing.  *Defs. of Wildlife*, 504 U.S. at 561.

To demonstrate standing, Plaintiffs must satisfy a three-pronged test.  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Defs. of Wildlife*, 504 U.S. at 560).  First, Plaintiffs must have suffered an injury-in-fact, defined as a harm that is "concrete and actual or imminent, not conjectural or hypothetical."  *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) (quoting *Steel Co.*, 523 U.S. at 103). Second, the injury claimed must be fairly traceable to the governmental conduct alleged.  *Sierra Club*, 292 F.3d at 898.  No standing exists where the court "would have to accept a number of very

---

[8]   Although district courts in some recent cases have declined to dismiss the President as a party at the motion-to-dismiss stage on grounds that doing so would be premature in light of uncertainty about the relief that could be provided by the defendant agencies, that is not the situation here.  *See Centro Presente v. DHS*, 332 F. Supp. 3d 393, 418 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018).  Unlike those cases, relief against DoD here would be sufficient to address claims seeking to halt barrier construction, assuming Plaintiffs have standing.  *See Swan*, 100 F.3d at 978.

speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980). Finally, it must be likely that the requested relief will redress the alleged injury. *Sierra Club*, 292 F.3d at 898.

Even assuming Plaintiffs have sufficiently pled a concrete and actual injury-in-fact,[9] the Complaint fails to satisfy the traceability and redressability prongs of Article III's standing requirement. "The 'traceability' and 'redressability' requirements are closely related." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 801 (D.C. Cir. 1987) (Bork, J.) (citing *Von Aulock v. Smith*, 720 F.2d 176, 180 (D.C. Cir. 1983)). In such cases, both prongs can be said to focus on principles of causation: traceability turns on the causal nexus between the challenged agency action and the asserted injury, while redressability centers on the causal connection between the asserted injury and the requested judicial relief. *See Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). Despite these similarities, however, each inquiry has its own emphasis. Causation remains inherently historical; redressability quintessentially predictive. *See id.*

   *a.   Plaintiffs do not satisfy the traceability prong.*

Plaintiffs fail to demonstrate how they suffer any actual injury that is traceable to the President's Proclamation, or any actions of the Acting Secretary of Defense undertaken pursuant to §§ 2808 or 284. In fact, any construction on their property will be funded by money appropriated by

---

[9]   Plaintiffs' alleged injuries in this case amount to the threat of possible, future barrier construction. At this point, however, CBP is only seeking to obtain a temporary right of entry to survey and assess the individual Plaintiffs' property. *See, e.g.*, Declaration of Loren Flossman ("Flossman Decl.") ¶ 6 (attached hereto as Ex. 1). The organizational Plaintiff's alleged injury is even less definite, as it does not specifically identify a single barrier project that will purportedly harm its members. The possibility of future construction is not a concrete or imminent injury sufficient to confer standing. *See Tex. Border Coal. v. Napolitano*, 614 F. Supp. 2d 54, 62 (D.D.C. 2009) (holding that where "it is unclear from the complaint whether any of the property owned by the plaintiff's members will actually be condemned" the plaintiffs did not show they would "personally . . . suffer[] some actual or threatened injury as a result of the putatively illegal conduct of the defendant"). But because Plaintiffs have clearly not satisfied the traceability and redressability prongs, the Court need not address whether Plaintiffs have pled an injury-in-fact.

Congress in CBP's annual appropriation. Ignoring that fact, Plaintiffs merely speculate that the construction of a border barrier in the Rio Grande Valley, including the planned project, will be funded by the legal authorities challenged in this action. Indeed, a single allegation in their Complaint states that the individual Plaintiffs were "informed that the federal government would seek to build a wall on their properties if money were available in 2019." Pls.' Compl. ¶ 2. Plaintiffs do not identify who made this alleged statement, when, or in what context, and it is too vague to plausibly show that the planned project, or any other barrier project in the Rio Grande Valley, will be funded by the authorities challenged in this suit. *Friends of Animals v. Jewell*, 115 F. Supp. 3d 107, 119 (D.D.C. 2015) (holding that vague allegations do not suffice to establish standing) (citing *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 46 (D.C. Cir. 2002)). This is especially true where Congress appropriated $1.375 billion dollars for border barrier projects in the Rio Grande Valley for fiscal year 2019. *See* Pub. L. No. 116-6, § 230. The Court need not accept Plaintiffs' "speculative inferences and assumptions" in determining whether they have "connect[ed] [the] alleged injury with [the challenged conduct]." *Winpisinger*, 628 F.2d at 139; *see Iqbal*, 556 U.S. at 678. The face of the Complaint shows they have not.

Moreover, Plaintiffs' claim that their alleged harm is caused by the President's Proclamation and the Acting Secretary's use of his authority under §§ 2808 and 284 is simply incorrect. As explained by Loren Flossman, the Acquisition Program Manager for the Wall Program Management Office in CBP, the border barrier project planned for the individual Plaintiffs' land "will be funded using CBP's Fiscal Year 2018 appropriations." Flossman Decl. ¶ 16. Indeed, CBP informed the individual Plaintiffs of the funding source for the planned project in letters dated January 2019 (Pls.' Compl. ¶¶ 6, 9, 12). *See, e.g.*, Flossman Decl., Ex. B (requesting access to a portion of Plaintiffs' property for the purpose of assessing it "for possible acquisition in support of [CBP] construction of border infrastructure *authorized by Congress in the Fiscal Year 2018 appropriation* and other funded tactical

33

infrastructure projects.") (emphasis added).[10]   The fiscal year 2018 appropriation provided CBP with $1.571 billion for procurement, construction and improvement activities, of which $196 million was allocated "for primary pedestrian fencing along the southwest border in the Rio Grande Valley Sector." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, 132 Stat. 348.

Further, Mr. Flossman explains that CBP will not use funds transferred pursuant to any of the authorities challenged in this suit—the Proclamation, § 2808, or § 284—"for any ongoing or planned barrier construction" in the entire Rio Grande Valley ("RGV") sector.[11]   Second Declaration of Loren Flossman ("Second Flossman Decl.") at ¶ 8 (attached hereto as Ex. 2).   Rather, "[a]ll barrier construction projects currently ongoing or planned in the RGV are or will be funded" from only CBP's fiscal year 2018 appropriations, CBP's fiscal year 2019 appropriations, or funds received from the Treasury Forfeiture Fund pursuant to 31 U.S.C. § 9705.   *Id.*

Thus, evidentiary material in the record establishes that neither the planned project at issue in Plaintiffs' Complaint, nor any project in the area of the Rio Grande Valley allegedly used and enjoyed by the organizational Plaintiff's members, will "use funds transferred pursuant to authorities invoked in the . . . national emergency proclamation, including 10 U.S.C. § 2808, or . . . 10 U.S.C. § 284." Flossman Decl. ¶ 17; *see* Second Flossman Decl. ¶ 8.   Because Plaintiffs have not alleged that Defendants are acting pursuant to the statutory authorities they dispute, they cannot establish the traceability prong of Article III's standing requirement.   *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (holding the plaintiffs failed to establish traceability where they could not show the

---

[10]   As the Flossman Declaration explains, letters sent to the individual Plaintiffs in September 2018 (Pls.' Compl. ¶¶ 6, 9, 12) identified fiscal year 2019 appropriations as the source of funding for possible construction.   *See* Flossman Decl. ¶ 16.   Mr. Flossman affirms that this reference was an error, *id.*; the letter should have referred to fiscal year 2018.

[11]   The RGV spans approximately 300 miles along the Rio Grande River from its most eastern point and includes Starr County (where the individual Plaintiffs reside) and Hidalgo County (where the organizational Plaintiff is headquartered), as well as 32 other surrounding counties. *Id.* ¶ 5.

government acted under the specific statutory authority being challenged); Wright, Miller & Cooper,

Fed. Practice & Procedure, § 3531.4 (2d ed. 1984) ("The very notion of injury implies a causal

connection to the challenged activity; an injury caused by other events is irrelevant" to standing).

> b. *Plaintiffs do not satisfy the redressability prong.*

Plaintiffs also have not established that the judgment they seek would redress the injuries they

have identified.  "Redressability examines whether the relief sought, assuming that the court chooses

to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y,* 94

F.3d at 663-64.  In this action, Plaintiffs seek a declaratory judgment that the President's Proclamation

was invalid and that Defendants cannot lawfully use DoD funds for construction of a border barrier,

including the planned project, under §§ 2808 or 284.  Pls.' Compl., Prayer for Relief ¶ (A)-(B).  They

also seek injunctive relief to prevent DoD from using funds under those authorities to build a border

barrier. *Id.* ¶ (C).  To demonstrate redressability, Plaintiffs would have to allege (and ultimately prove)

that it is "likely," as opposed to merely "speculative," *Friends of the Earth, Inc. v. Laidlaw Env't Srvs., Inc.,*

528 U.S. 167, 181 (2000), that the requested judgment would redress their injuries.  Plaintiffs cannot.

An "adequate examination" of redressability requires that the court first "identify the

components of [Plaintiffs'] alleged harm." *Freedom Republicans, Inc. v. Fed. Election Comm'n,* 13 F.3d 412,

416 (D.C. Cir. 1994).  Here, Plaintiffs identify alleged harms resulting from the planned project on the

individual Plaintiffs' land or other barrier projects in the wildlife corridor of the Rio Grande Valley

allegedly used by the organizational Plaintiff's members.  Pls.' Compl. ¶¶ 2, 7, 10, 13, 18.  Plaintiffs

have not demonstrated that it is "likely" an order declaring the President's Proclamation and DoD's

use of §§ 2808 and 284 unlawful, and enjoining DoD from using those authorities to fund border

barrier construction, will result in the removal of the harm they have identified.  *Steel Co.,* 523 U.S. at

107 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court;

that is the very essence of the redressability requirement.").  Even if this Court were to enter such

relief, it would have no effect on CBP moving forward with the planned project at issue here, or any ongoing or planned barrier projects in the RGV, because those projects will be funded from other sources that are not disputed in Plaintiffs' Complaint. *See supra* 33-34.

Accordingly, the judgment sought by Plaintiffs in this case would not likely redress their alleged injuries. Plaintiffs therefore lack standing to pursue their claims, and this action should be dismissed for lack of subject matter jurisdiction.

2.   Plaintiffs Cannot Establish Article III Standing to Challenge Future Border Barrier Construction Under § 2808.

Plaintiffs lack standing to bring claims challenging border barrier construction under § 2808 because the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under that authority.

Article III requires that cases be decided in the concrete context of an actual case or controversy, not in the abstract.   U.S. Const. art. III, § 2, cl. 1.   "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. at 414 n.5)).   "[A]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted).   By limiting the judicial power to instances in which specific individuals have suffered concrete injuries, standing requirements "serve[] to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* at 408.

Here, Plaintiffs cannot demonstrate a certainly impending injury because, as DoD confirms, the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808.   Declaration of Kenneth P. Rapuano, Assistant Secretary of Defense for Homeland Defense and Global Security ("Rapuano Decl.") ¶¶ 4-5 (attached hereto as Ex. 3).   Given the absence of a decision by the Acting Secretary about § 2808 at this time, Plaintiffs are left with nothing but allegations of contingent future injuries based on anticipated barrier construction in

36

unidentified areas.  *See* Pls.' Compl. ¶ 33.

The fact that the President invoked § 2808 in the Proclamation is not sufficient to establish certainly impending injury where decisions about utilizing § 2808 for particular projects rest with the Acting Secretary of Defense.  Article III jurisdiction cannot rest on speculation that DoD may use § 2808 at some point in the future and might do so in a way that injures Plaintiffs.  It is entirely possible that no barrier projects funded by § 2808 will be built in any location where Plaintiffs would have a claim to a cognizable injury.  Accordingly, speculation about injuries that might result from yet-to-be identified barrier construction projects that might be funded under § 2808 is the type of "possible future injury" that is not sufficient to establish Article III jurisdiction.  *See Clapper*, 568 U.S. at 409.

The nature of DoD's decisionmaking regarding any future use of § 2808 further illustrates why Plaintiffs lack standing to bring this claim.  Before authorizing § 2808 construction, the Acting Secretary of Defense will determine that the project is "necessary to support such use of the armed forces."  10 U.S.C. § 2808.  That determination can be considered only within the context of the Acting Secretary of Defense authorizing specific military construction projects presented to him for approval.  Moreover, in order to fund any projects under § 2808, DoD will need to defer construction of an equal amount of appropriated, but unobligated, military construction projects, and DoD has not made these decisions at this time.  The Court should not decide Plaintiffs' § 2808 claim in the abstract when specific decisions have not been made, let alone made in a manner that would injure Plaintiffs. Given the absence of any concrete harm, Plaintiffs lack standing to pursue their § 2808 claim.

## II.     Plaintiffs' Ultra Vires and Constitutional Claims Do Not State a Claim on Which Relief Can Be Granted.

In addition to the jurisdictional problems explained above, Plaintiffs fail to state a claim.  First, Plaintiffs' purported "non-statutory right of action to enjoin and declare unlawful official action that is ultra vires" fails.  *See, e.g.*, Pls.' Compl. ¶ 53.  They erroneously assert Presidential action where there is none.  Moreover, they impermissibly pursue an implied nonstatutory cause of action where a proper

statutory vehicle exists.  But even if they could proceed pursuant to a nonstatutory cause of action to challenge "ultra vires" acts, the high standard to state such a claim is not met.  Second, Plaintiffs' claims that Defendants have violated the separation of powers fail because they are nothing more than alleged statutory violations dressed in constitutional garb.  At bottom, Plaintiffs' artful pleading should be seen for what it is: an attempted end run around the typical rules for judicial review of agency action.  The attempt is unsuccessful, and the Complaint fails to state a claim under Rule 12(b)(6).

### A.    Plaintiffs' "Ultra Vires" Claims Must Be Dismissed.

1.    Plaintiffs Fail To State a Claim for Ultra Vires Action Against the President.

Plaintiffs' allege that the Proclamation violated the NEA "[b]ecause no national emergency exists with respect to immigration across the southern border," Pls.' Compl. ¶ 61, and that the President's "direction" to use the authority set forth in §§ 2808 and 284 was unlawful, *id.* ¶¶ 67, 71. As explained above, no suit for equitable relief can be maintained against the President.  But even if it could be, Plaintiffs have failed to state any claim for ultra vires action against the President.  The only action the President took here is to declare a national emergency pursuant to the NEA, and any claim that the President violated the NEA should be dismissed as nonjusticiable.  Separately, the President is not responsible for administering §§ 2808 or 284, nor do Plaintiffs allege that the President has taken any action pursuant to these statutes.  On these facts alone, Plaintiffs have failed to state a claim against the President for violations of §§ 2808 or 284.

Whether the President invoked, or otherwise directed action pursuant to these statutes, without more, is not actionable.  That is because the statutes provide the Secretary of Defense, not the President, with authority to act.  *See* 10 U.S.C. § 2808(a); 10 U.S.C. § 284(a); *cf. Nat'l Ass'n of Gov. Emps. v. Fed. Labor Relations Auth.*, 179 F.3d 946, 950 (D.C. Cir. 1999) ("[I]f the President orders the Secretary of State to terminate an employee, the order does not effect the termination—only the Secretary of State can terminate an employee whom the Secretary was statutorily authorized to

appoint.") (emphasis omitted).  The President's invocation of § 2808 did nothing more than "ma[ke] available . . . to the Secretary of Defense" the construction authority § 2808 provides.  *See* Proclamation.  The Complaint therefore fails to state a statutory violation against the President, and Plaintiffs' claims of unlawful Presidential action in violation of §§ 2808 and 284 should be dismissed.

2.     Plaintiffs Must Raise Their Statutory Challenges Under the APA.

Plaintiffs' claims against the Acting Secretary of Defense's use of his authority under §§ 2808 and 284 for the purpose of border wall construction are properly raised pursuant to the APA only— not a purported "non-statutory right of action."[12]

The APA provides a cause of action for any person "adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  Through the APA, Congress conferred express jurisdiction on reviewing courts to "hold unlawful" agency action that is "not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations."  *Id.* § 706(2)(A), (C).  Here, Plaintiffs seek precisely the type of review Congress provided in the APA—review of decisions made pursuant to authority under §§ 2808 and 284.  Yet Plaintiffs do not allege any violation of the APA or identify another statutory cause of action under which to pursue their claims.

Instead, Plaintiffs bring their claims pursuant to a purported "non-statutory right of action" to enjoin and declare unlawful "ultra vires" action.  Pls.' Compl. ¶¶ 53, 64, 69, 73, 79.  But Plaintiffs cannot invoke the doctrine of nonstatutory review for the actions complained of here.  Courts may review agency action under an independent ultra vires cause of action only when the plaintiff would otherwise be "wholly deprive[d]" of a "meaningful and adequate means of vindicating its statutory rights" and when Congress has not precluded judicial review.  *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)); *see also Chamber*

---

[12]     The President's actions are not reviewable under the APA.  *Franklin*, 505 U.S. at 801.  Justice Scalia observed in *Franklin* that suits against agency officials are the proper means of challenging Presidential action.  *See id.* at 828 (Scalia, J., concurring in part and concurring in the judgment).

*of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). As a result, "a *Leedom v. Kyne* claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors,* 589 F.3d 445, 449 (D.C. Cir. 2009).

Plaintiffs have not been "wholly deprive[d]" of a means for review of their claims so long as APA review is available. *See Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007); *Wise v. Glickman*, 257 F. Supp. 2d 123, 127 n.1 (D.D.C. 2003). And given the availability of the APA, this is not "a proper case" for courts to provide the "judge-made remedy" of an implied cause of action in equity to enjoin action by public officials. *Armstrong*, 135 S. Ct. at 1384 (stating that the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations" and holding plaintiffs could not "circumvent" statutory restrictions "by invoking our equitable powers"). Indeed, inferring a cause of action under the Court's judicial power is a "significant step under separation-of-powers principles" because it intrudes upon "Congress, [which] has a substantial responsibility to determine" whether suit should lie. *Ziglar*, 137 S. Ct. at 1856. There is no basis for the Court to take that step here in light of Congress's intent for claims such as these—*i.e.*, that an agency has exceeded its statutory authority—to be reviewed under the APA. Accordingly, Plaintiffs' ultra vires claims should be dismissed.

3.    Plaintiffs Have Not Alleged Any Ultra Vires Actions.

Even if the Court were to determine that the ultra vires framework is properly applied to Plaintiffs' claims, their allegations do not support a finding of ultra vires actions. Courts review ultra vires claims under a "very stringent standard" and such claims "rarely succeed[]." *Nyunt*, 589 F.3d at 449; *see also Trudeau v. FTC*, 456 F.3d 178, 189–90 (D.C. Cir. 2006). To give rise to such a claim, the agency must "patently [] misconstru[e]" a statute, "disregard[] a specific and unambiguous statutory directive," or "violate[] some specific command of a statute." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations omitted). Unless an agency violated a "clear and mandatory"

statutory provision, ultra vires review is not warranted. *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Servs. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006) (quoting *Leedom*, 358 U.S. at 188) (hereinafter "*NATCA*"). Mere allegations that the agency improperly exercised its authority are not enough to justify ultra vires review. *See, e.g.*, *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307-08 (D.C. Cir. 2014). Plaintiffs' allegations fall well short of meeting this high standard.

     *a.*   <u>10 U.S.C. § 2808</u>

     Plaintiffs' claim of ultra vires agency action in violation of 10 U.S.C. § 2808 fails. As explained above, the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808. *See* Rapuano Decl. ¶ 5. This fact mandates dismissal of Plaintiffs' § 2808 claims both because it creates a jurisdictional defect and because, without such a decision, there has been no violation of § 2808, much less a clear and egregious violation of the sort necessary to enjoin agency action under ultra vires review. *See NATCA*, 437 F.3d at 1264.

     But even putting aside this threshold issue, Plaintiffs have not alleged a violation of any "clear and mandatory" language in § 2808. *See id.* They claim "the specific requirements of section 2808 are [] not satisfied" because "[t]he planned border wall is not a 'military construction project' that is 'necessary to support … use of the armed forces.'" Pls.' Compl. ¶ 33. But nowhere do Plaintiffs point to a "specific and unambiguous statutory directive" that Defendants have disregarded. *See Griffith*, 842 F.2d at 494. And they cannot. The statute does not include such clear and mandatory language. Instead, § 2808 provides the Secretary of Defense with authority to "undertake military construction projects" that are "necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). The statute provides no guidance as to the meaning of what projects would be "necessary to support such use of the armed forces." And this type of discretionary military decision is "better left to those more expert in issues of defense" and not subject to judicial second-guessing. *See, e.g., Dist. No. 1, Pacific Coast Dist., Marine Engineer's Beneficial Ass'n v. Maritime Admin.*, 215 F.3d 37, 41–42 (D.C. Cir. 2000); *see*

*also NFFE v. United States*, 905 F.2d 400, 405–06 (D.C. Cir. 1990) ("[T]he federal judiciary is ill-equipped to conduct reviews of the nation's military policy.").   Although "military construction project" is a statutorily defined term, its definition is broad and illustrative, not specific or exclusive. *See* 10 U.S.C. § 2801(b).  The term "military construction" is similarly broadly defined to "*include* any construction . . . of any kind carried out with respect to a military installation." *Id.* § 2801(a) (emphasis added).  A "military installation," in turn, "means a base, camp, post, station, yard, center, *or other activity* under the jurisdiction of a Secretary of a military department."  *Id.* § 2801(c)(4) (emphasis added).  Plaintiffs offer no explanation as to how any construction undertaken pursuant to the expansive provisions of § 2808 would contravene clear and mandatory statutory language. Accordingly, Plaintiffs have not met the strict standard to state an ultra vires cause of action with respect to § 2808.

> b.   *10 U.S.C. § 284*

Plaintiffs likewise have not pled facts sufficient to demonstrate that Defendants violated the "clear and mandatory" language of § 284.  *Id.*  Plaintiffs allege that the President's direction, and the Acting Secretary of Defense's implementation of that direction, to use § 284 to fund border barrier construction are ultra vires "[b]ecause transferring funds to construct a border wall is not authorized by" the statute.  Pls.' Compl. ¶¶ 70, 81.  Yet Plaintiffs' Complaint is devoid of any "factual matter," which if accepted as true, would plausibly state a claim to relief.  *Iqbal*, 556 U.S. at 678.

The sole "factual" allegation pled by Plaintiffs is that § 284 "does not authorize use of transferred funds for the construction of the planned border wall."  Pls.' Compl. ¶ 36.  This assertion is conclusory at best, and thus not entitled to a presumption of truth on a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (holding that mere "labels and conclusions" and "'naked assertion[s]' devoid of 'further factual enhancement'" are not sufficient under Rule 12(b)(6) (quoting *Twombly*, 550 U.S. at 555). Plaintiffs do not plead facts demonstrating *how* Defendants allegedly violated § 284, nor do they

adequately allege that Defendants "patently [] misconstrue[ed]" the statute or have "disregarded" its "specific and unambiguous . . . directive." *Griffith*, 842 F.2d at 493. Because Plaintiffs do not point to any "clear and mandatory" statutory language in § 284 that Defendants have allegedly violated, Plaintiffs' allegations are insufficient to state a claim to relief under the extraordinary standard applied to an ultra vires claim. *NATCA*, 437 F.3d at 1264.

In fact, Plaintiffs' allegations are not only conclusory, they are entirely incorrect. As explained in the Flossman Declarations, the planned project in dispute, and in fact any ongoing or planned project in the RGV as a whole, will not be funded using money transferred pursuant to § 284. *See* Flossman Decl. ¶ 17; Second Flossman Decl. ¶ 8. *See also Kaempe*, 367 F.3d at 963 (holding that a court need not "accept as true the complaint's factual allegations insofar as they contradict . . . matters subject to judicial notice"). Thus, Plaintiffs' assertions could not plausibly, or even possibly, state a claim that Defendants' actions vis-à-vis the border barrier construction complained of in the Complaint violated the statute. *See Rodriquez v. Laboratory Corp. of America Holdings*, 13 F. Supp. 3d 121, 133 (D.D.C. 2014) (dismissing claim under Rule 12(b)(6) where the only factual allegations pleaded in the complaint were contradicted by a document relied on by the plaintiff).

Accordingly, the ultra vires claims Plaintiffs raise must be dismissed.

**B.    Plaintiffs' Constitutional Claims Must Be Dismissed.**

Plaintiffs purport to raise separation-of-powers challenges to the Executive and agency actions at issue here. But these claims merely re-cast Plaintiffs' statutory claims in constitutional terms, and "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473. Defendants are not relying on independent Article II authority in order to undertake border construction; the actions alleged are being undertaken pursuant to statutory authority alone. The President did not seek to reallocate appropriated funds based upon any claim of inherent constitutional authority. Nor did the President claim that the declaration of a national

43

emergency gave him any authority that had not been expressly conferred by Congress.   Rather, Defendants rely solely upon available statutory authorities—as relevant here, §§ 2808 and 284—that Congress has delegated to the Executive.   The outcome of this case thus turns on whether the statutes authorize the challenged actions.   Because disagreements about how to construe statutes do not raise constitutional problems, these claims should be dismissed.

*Dalton* disposes of Plaintiffs' constitutional claims.   In *Dalton*, the Supreme Court specifically rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471.   The Court instead recognized that "[t]he distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Id.* at 474.

By asserting that actions that allegedly exceed statutory authority are, for that reason alone, constitutional violations, Plaintiffs' Complaint does precisely what the Court disapproved of in *Dalton*. Plaintiffs assert no constitutional violation separate from the alleged statutory violations.   They do not allege that Defendants' compliance with the statutes at issue would be unconstitutional.   Instead, Plaintiffs assert that Defendants violated the statutes.   For example, "[b]ecause transferring funds to construct a border wall is not authorized by 10 U.S.C. § 284," the President's direction to do so purportedly "usurps legislative authority conferred by the Constitution on the Congress." Pls.' Compl. ¶ 70; *see id.* ¶ 66 (similar allegation with respect to § 2808).   These bare allegations of ultra vires statutory actions do not state constitutional claims.   *See Dalton*, 511 U.S. at 473–74.

Plaintiffs do not allege that the President has exercised his inherent authority under Article II of the Constitution.   Nor does the President purport to do so.   This case thus stands in sharp contrast to *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the President issued an order directing the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate

of his powers under the Constitution," thereby conceding a lack of statutory authority. *Id.* at 585–87. The Court held the action unconstitutional. *Id.* at 589. In his concurrence, Justice Jackson emphasized that the President had acted in the absence of congressional authorization, where his "power is at its lowest ebb" and such exercise of power must be "scrutinized with caution." *Id.* at 637–38 (Jackson, J. concurring). That is not the situation here. Each action—including the Proclamation—is based on express statutory authority. The President and his agents are acting "pursuant to an express . . . authorization of Congress," the situation in which "his authority is at its maximum." *Id.* at 635 (Jackson, J. concurring). *Youngstown* is therefore inapposite. *See AFLCIO v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc); *see also Dalton*, 511 U.S. at 473.

If Plaintiffs' allegations were found to rise to the level of constitutional issues, then *every* allegation that the President or his agents exceeded their statutory authority in some way could be re-pleaded as a constitutional separation-of-powers claim. The Supreme Court has foreclosed such tactics, recognizing their inconsistency with well-established precedent "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472. Because where "the President concedes . . . that the only source of his authority is statutory, no constitutional question whatever is raised," this Court should dismiss all constitutional claims.[13] *Id.* at 474 n.6. (internal citation omitted).

## CONCLUSION

For these reasons, the Court should dismiss this case pursuant to Rules 12(b)(1) and 12(b)(6).[14]

---

[13] Even if this Court were to determine that the Complaint stated a constitutional cause of action, challenges to the constitutionality of agency action must be brought pursuant to the APA applying its procedural strictures. *See* 5 U.S.C. § 706(2)(B); *see also, e.g., Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1237–38 (D.N.M. 2014); *Harvard Pilgrim Health Care of New Eng. v. Thompson*, 318 F. Supp. 2d 1, 10–11 (D.R.I. 2004).

[14] This judicial district does not provide a procedure to notice a motion on the Court's calendar for a hearing; however, upon the completion of briefing, Defendants stand ready to appear for argument at the Court's earliest convenience.

Dated:  April 2, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Andrew I. Warden
ANDREW I. WARDEN (IN Bar 23840-49)
Senior Trial Counsel, Federal Programs Branch

/s/ *Kathryn C. Davis*
KATHRYN C. DAVIS (D.C. Bar No. 985055)
MICHAEL J. GERARDI (D.C. BAR NO.
1017949)
LESLIE COOPER VIGEN (D.C. Bar No.
1019782)
RACHAEL WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Tel: (202) 616-8298
Fax: (202) 616-8470
E-mail: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Alvarez, *et al.*,

        Plaintiffs,

    v.

Trump, *et al.*,

        Defendants.

No. 1:19-cv-00404 (TNM)

**DECLARATION OF LOREN FLOSSMAN**

I, Loren Flossman, declare as follows:

1. I am the Acquisition Program Manager for the Wall Program Management Office (Wall PMO), U.S. Border Patrol Program Management Directorate, U.S. Customs and Border Protection (CBP), an agency of the Department of Homeland Security (DHS). I have held this position since May 2018. Prior to this, I was the Director of the Border Patrol & Air and Marine Program (BPAM) Management Office within the Office of Facilities and Asset Management, CBP. BPAM is the office within CBP that historically was responsible for the construction and maintenance of facilities, tactical infrastructure, and border infrastructure such as barriers and roads that are required by the United States Border Patrol (Border Patrol) or CBP Air and Marine. Responsibility for border barrier projects was transferred from BPAM to Wall PMO. Therefore, Wall PMO is now responsible for border barrier projects, including the border barrier projects that are ongoing or being planned for the Rio Grande Valley sector (RGV) in Starr and Hidalgo Counties, Texas.

1

2. In my position, I am personally aware of CBP activities occurring in support of ongoing or planned border barrier projects in the RGV area of southern Texas, including activities on or near the properties of Ms. Nayda Alvarez, Mr. Leonel Romeo Alvarez, and Ms. Yvette Gaytan (collectively, the individual Plaintiffs). I make this declaration based upon my personal knowledge and belief, as well as information that I have received in my official capacity.

3. The purpose of this declaration is to inform the Court that the border barrier project planned for the individual Plaintiffs' property will be constructed using funds appropriated by Congress and not, as Plaintiffs claim, funds transferred pursuant to the President's national emergency proclamation, 10 U.S.C. § 2808, or 10 U.S.C. § 284.

### History of Negotiations with the Individual Plaintiffs

4. Beginning in 2018, the United States Army Corps (USACE), on behalf of CBP, began initial title work for a tract of land designated as RGV-RGC-5035 (the Tract).

5. The initial title work for the Tract identified several individuals who may have ownership interests in the land, including the individual Plaintiffs.

6. Accordingly, on September 12, 2018, CBP sent a letter to the identified landowners requesting that they provide CBP with a non-permanent Right of Entry (ROE) to survey the Tract. *See e.g.,* Exhibit A. The ROE authorizes the Government to enter upon private property to perform the due diligence required prior to acquiring property for construction of border barriers and other supporting infrastructure such as roads, gates, lighting, and technology, as well as for future maintenance and repair of those structures. The surveys include environmental, geo-technical, and boundary assessments which allow the Government to finalize the design and alignment of the barrier projects.

2

7. CBP is still in the process of determining all the ownership details for the Tract, which is another reason that CBP requested a ROE to survey. Working on behalf of CBP, USACE has confirmed that the title to the Tract is very complex with numerous people that hold undivided interests in portions of the Tract, such as Yvette Gaytan. Several other people, like Nayda Alvarez, seem to hold an interest in a specific portion of the Tract.

8. In late October 2018, Ms. Gaytan sent CBP a signed ROE.

9. In November 2018, CBP met with Mr. Leonel Romeo Alvarez who stated that she would not sign an ROE.

10. In November 2018, USACE spoke with Ms. Nayda Alvarez who stated that she would not sign an ROE.

11. In January 2019, CBP sent the identified landowners letters indicating that because CBP had not received a response to its September request for a signed ROE, CBP would seek to obtain the ROE by filing a Declaration of Taking (DT). *See e.g.,* Exhibit B.

12. Without a signed ROE, CBP's typical next step would be to refer the matter to the United States Attorney's Office for the Southern District of Texas (SDTX). An Assistant United States Attorney would then try to negotiate with the landowners for a signed ROE prior to filing a DT. To date, CBP has not yet referred the individual Plaintiffs' ROE actions to SDTX. All legal action with respect to the Tract is currently on hold due to this pending litigation.

13. Because a survey and appraisal have not yet been completed for the Tract, CBP has not started the process to negotiate an Offer to Sell with the individual Plaintiffs. Further,

CBP will not begin construction on the Tract until the Government has acquired title to the property and has been granted possession of the property.

## The Planned Project

14. CBP is seeking to construct a border barrier system on the Tract which could include a bollard-style barrier, a 150-foot enforcement zone, gates for property owners to access the south side of the barrier, lighting, cameras, and an all-weather road.  While CBP has not yet requested public input for the planned project on the Tract, CBP anticipates that the materials that will be released with its request for input will be substantively similar to those released for a similar project planned in the RGV.  *See* Exhibit C.

15. Previously, CBP had considered building a camera tower on a portion of the Tract. However, the project was later paused, and CBP does not currently have plans to resume a tower project on the Tract.

## Project Funding

16. As CBP informed the individual Plaintiffs in its January 2019 letters, the project planned for the Tract will be funded using CBP's Fiscal Year 2018 appropriations (Public Law No. 115-141, § 230).  *See* Exhibit B.  Although CBP's September 2018 letters to the identified landowners (*see* Exhibit A), reference the use of CBP's Fiscal Year 2019 appropriations, that reference was in error.

17. The project planned for the Tract will not, as the individual Plaintiffs allege, use funds transferred pursuant to authorities invoked in the President's February 15, 2019 national emergency proclamation, including 10 U.S.C. § 2808, or pursuant to 10 U.S.C. § 284.

18. Consistent with other cases, any DT ultimately filed in relation to the project planned for the Tract will state the funding and taking authority being used for acquisition of the property.

This declaration is made pursuant to 28 U.S.C. § 1746.  I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on this 2/ day of April, 2019.

Loren Flossman
Acquisition Program Manager
U.S. Customs and Border Protection

# EXHIBIT A

1200 Pennsylvania Avenue NW
Washington, DC 20229



**U.S. Customs and
Border Protection**

September 12, 2018

Nayda Alvarez


Dear Mrs. Alvarez:

The purpose of this letter is to request your written permission to enter upon your land in accordance with the enclosed Right of Entry for Survey and Site Assessment (ROE-S) and accompanying map.  Once you have had an opportunity to review the enclosed documents we invite you to call or email the below listed point of contact to review the material with you and/or to address any questions you may have.

You are receiving this letter because the U.S. Government has identified a portion of your property that we wish to access for the purpose of conducting environmental assessments, property surveys, appraisals and any other such work which may be necessary and incidental to the Government's assessment of the Property for possible acquisition in support of U.S. Customs and Border Protection's (CBP) construction of border infrastructure authorized by Congress in the Fiscal Year 2019 appropriation and other funded tactical infrastructure projects.

Border security tactical infrastructure, such as border walls, lighting, and roads, are critical elements to gain effective control of our Nation's borders.  The purpose of border security infrastructure is to deter illicit cross-border activity such as drug smuggling, border violence and illegal immigration.

The planned assessments outlined in the ROE-S are scheduled to occur intermittently over the time period specified in the document.  Only the portion of your property that may be affected by construction of border security tactical infrastructure, as shown on the map of the enclosed ROE-S, will be environmentally assessed by the U.S. Government, its agents, employees, and contractors.  The ROE-S is required beyond the proposed project area for access to each parent tract monument in order for the surveyor to physically locate the subject area in alignment with adjoining property boundaries. State law requires the surveyor to produce work of sufficient quality as to prevent boundary line disputes and be technically unbiased for all impacted parties. By signing this form, you are granting written permission to the U.S. Government, its agents, employees, and contractors to conduct the assessment activities described.  Those activities may commence immediately following execution of the document.

We hope that you and other landowners in the Rio Grande Valley will assist us in our strategic efforts to secure our Nation's borders.  Enclosed for your review are three copies of the ROE-S form.  If you have no further questions, please retain one copy of the ROE-S for your records and return two signed copies in the enclosed, pre-addressed and postage paid envelope.  Upon receipt of your signed copies, the U.S. Government will complete and return a fully executed copy for your records.  If you are acting in an agent capacity for a corporation or organization, please fill in the Certificate for Corporations and Partnerships found on page 3.  If your property is currently under lease, license or is otherwise occupied, please have the tenant or licensee fill in the right-of-entry portion for tenant information so consent from that individual can be obtained as well.

CBP has collaborated with the U.S. Army Corps of Engineers (USACE) to obtain access to the real estate to support the work effort described above.  Therefore, if you have any questions you can speak with a USACE Realty Specialist toll free by calling -1-866-848-1221 or you can make contact via email at border.infrastructure.projects@usace.army.mil.

Sincerely,

Loren Flossman
Wall Program Portfolio Manager
USBP Program Management Office Directorate
U.S. Border Patrol

Enclosure

**Border Infrastructure Project(s)**                              **DACW63-9-18-_____**

## U.S. CUSTOMS AND BORDER PROTECTION

## DEPARTMENT OF HOMELAND SECURITY

## Right-of-Entry For Survey and Site Assessment

The undersigned, hereinafter called the "Owner", hereby grants to the United States of America, hereinafter called the "Government", a temporary right-of-entry upon Owner's property described below, hereinafter called the "Property."  This right-of-entry is granted upon the following terms and conditions:

1. The Government's officers, employees, agents, and contractors shall have the right to enter upon the Property for the purpose of conducting environmental assessments and property surveys, including the right to temporarily store, move and remove necessary equipment and supplies; survey, stake out, appraise, bore and take soil and/or water samples, and perform any other such work which may be necessary and incidental to the Government's assessment of the Property for Border Infrastructure Projects in the Rio Grande Valley Sector area of responsibility.

2. This right-of-entry is irrevocable for a period of Eighteen (**18**) months from the date of this instrument.

3. The rights granted herein include the right of ingress and egress on other lands of the Owner not described below, provided such ingress and egress is necessary to access the Property and is not otherwise conveniently available to the Government.

4. All tools, equipment, and other property taken upon or placed upon the land by the Government shall remain the property of the Government and may be removed by the Government at any time within a reasonable period after the expiration of this right-of-entry.

5. If any action of the Government's officers, employees, agents, or contractors in the exercise of this right-of-entry results in damage to real property, an administrative claim can be made using a Standard Form (SF) 95 (Claim for Injury, Damage, or Death).  The SF 95 must include supporting documentation and state a claim for monetary damages in a sum certain amount for any alleged loss or damage of property, and must be filed within two years after the claim accrues.  Please submit the SF 95 and supporting documentation to the CBP Port of Entry or United States Border Patrol station nearest to where the alleged damages occurred.

6. The Property that is subject to this right-of-entry is located in the State of Texas, County of Starr, and is shown on the attached Exhibit Map.

7. I affirm that I have the authority to grant this right-of-entry onto the Property described above.

1

**Border Infrastructure Project(s)**                    DACW63-9-18-_____

Dated this _____ day of _____, 20___          THE UNITED STATES OF AMERICA

_____                  By: _____
Owner's signature                                       Loren Flossman
                                                        Wall Program Portfolio Manager
_____                       USBP Program Management Office
Owner's printed name                                    Directorate
                                                        U.S. Border Patrol
Owner's mailing address:

_____

_____

_____

_____

Home Telephone: _____

Work Telephone: _____

**Owner requires notification prior to entry.   Yes    No    (please circle one)**

If yes, please provide the primary and alternate point of contact (POC) and phone
number and/or email.
Primary POC: _____
Alternate POC: _____

2

### CERTIFICATE OF AUTHORITY
*(applicable for Corporations and Organizations)*

**I,** _____*(name)*, certify that I am the _____ *(position held in organization)* of the _____*(organization)*, duly organized and registered in the State of Texas; that _____*(executor of instrument)*, who signed the foregoing instrument on behalf of the grantee, was then _____*(position of executor of instrument)* of said _____*(organization)*.  I further certify that the said officer was acting within the scope of powers delegated to this officer by the governing body of the grantee in executing said instrument.

**IN WITNESS WHEREOF,** I have hereunto set my hand, and the seal of the _____*(organization)*, this _____day of_____, 20_____.


By: _____

Typed Name: _____

Title: _____


**NOTE**:  THE PERSON SIGNING THE ABOVE CERTIFICATE <u>CANNOT</u> BE THE SAME PERSON THAT SIGNED THE RIGHT-OF-ENTRY.

3

**Border Infrastructure Project(s)**                    DACW63-9-18-_____

CONSENT OF TENANT:  *(if applicable)*

I hereby consent to the use of the property by the Government in accordance with this right-of-entry.

_____
Tenant's Signature

_____
Tenant's Printed Name

Owner's Mailing Address:
_____

_____

_____

Home Telephone: _____

Work Telephone: _____

**Tenant requires notification prior to entry.     Yes          No    (please circle one)**

If yes, please provide the primary and alternate point of contact (POC) and phone number and/or email.
Primary POC: _____
Alternate POC: _____

4

**Legend**

| | |
|---|---|
| XXXX | **Proposed Project Area** |
| XXXX | **Parent Tracts for Surveying Purposes** |
| xxxx / xxx | **OTLS** |

NAYDA          & ALVAREZ

**Reference**

| County ID | | Tracts |
|---|---|---|
| 9316 | 34534 | |
| 9995 | 62718 | RGV-RGC-5035 |
| 12748 | 85061 | |
| 16831 | 90408 | |

0    100    200 Feet

1 inch = 200 feet

Zapata

Starr

Camargo

Warning: This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

July 18, 2018

# EXHIBIT B



1200 Pennsylvania Avenue NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

January 9, 2019

Nayda Alvarez



Dear Mrs. Alvarez:


    Border security tactical infrastructure, such as border walls, lighting, and roads, are critical elements to gain effective control of our Nation's borders.  The purpose of border security infrastructure is to deter illicit cross-border activity such as drug smuggling, border violence and illegal immigration.

    The U.S. Government has identified a portion of your property that we need to access for the purpose of conducting environmental assessments, property surveys, appraisals and any other such work which may be necessary and incidental to the Government's assessment of the property for possible acquisition in support of U.S. Customs and Border Protection's (CBP) construction of border infrastructure authorized by Congress in the Fiscal Year 2018 appropriation and other funded tactical infrastructure projects.  The property is located in Starr County, identified as RGC-5035 on the attached Exhibit A.

    As of January 9, 2019, we have not received your permission to access the property, and because the Government has an immediate need to enter your property to conduct the necessary surveys, we have determined that it will be necessary to file an action in federal district court to allow us to enter for these purposes for a limited period of 12 Months.  We anticipate seeking this temporary right of entry within the next 90 days in the U.S. District Court of the Southern District of Texas. You will be served with notice upon the filing of the case. The pleading is called a Declaration of Taking and Complaint in Condemnation. Funds will be deposited into the registry of the court as just compensation, and supplemented if necessary, to cover any potential damage caused by the Government during site assessment work.

CBP has collaborated with the U.S. Army Corps of Engineers (USACE) to obtain access to the real estate to support the work effort described above.  Therefore, if you have any questions you can speak with a USACE Realty Specialist toll free by calling -1-866-848-1221 or you can make contact via email at border.infrastructure.projects@usace.army.mil

Sincerely,

Loren Flossman

Loren Flossman
Wall Program Portfolio Manager
USBP Program Management Office
Directorate
U.S. Border Patrol

Enclosure

**Legend**

| | |
|---|---|
| XXXX | **Proposed Project Area** |
| XXXX | **Parent Tracts for Surveying Purposes** |
| xxxx xxx | **OTLS** |

NAYDA   & ALVAREZ

**Reference**

| County ID | | Tracts |
|---|---|---|
| 9316 | 34534 | |
| 9995 | 62718 | RGV-RGC-5035 |
| 12748 | 85061 | |
| 16831 | 90408 | |

0   100   200 Feet

1 inch = 200 feet

Zapata

Starr

Camargo

Warning: This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

July 18, 2018

# EXHIBIT C



1300 Pennsylvania Avenue NW
Washington, DC 20229

U.S. Customs and
Border Protection

September 6, 2018

To Whom It May Concern,

U.S. Customs and Border Protection (CBP) is seeking your input concerning the construction of a levee/border wall system in the United States Border Patrol (USBP) Rio Grande Valley (RGV) Sector.  Based on the feedback CBP received as a part of its earlier outreach, CBP is extending the due date for comments to November 6, 2018.

CBP proposes to: (1) design and construct approximately 25 miles of levee/border wall system in Hidalgo County, Texas within the USBP's McAllen and Weslaco Stations' area of responsibility (AOR); and (2) design and construct approximately eight (8) miles of border wall system in Starr County, Texas within the USBP's Rio Grande City (RGC) Station AOR.  The border wall system project in the RGC Station AOR may include an additional four (4) miles.  The McAllen, Weslaco, and Rio Grande City Stations are all located within the USBP's RGV Sector.  More information about the projects is included in an attachment to this letter.

CBP is seeking input on potential impacts to the environment, culture, and commerce, including potential socioeconomic impacts, and quality of life.  CBP will be conducting environmental site surveys and assessments and is also gathering data and input from state and local government agencies, federal agencies, Native American tribes, and landowners that may be affected by or otherwise have an interest in the construction projects.  As the projects progress, there will be additional opportunities for public comment.  CBP will prepare environmental planning documents to evaluate potential environmental impacts and make those documents available for public review.

**How to Provide Comments**
Comments and information will be accepted until November 6, 2018.  Comments should include data or information that could help inform CBP's analysis of potential impacts.  Helpful comments are fact-based, include links to data or research, and provide specific information concerning potential impacts to biological, cultural, and natural resources.  If known, your response should include any state and local restrictions, permitting or other requirements that CBP should consider during project siting, construction, and operation.

Page 2

Comments, questions, or concerns can be emailed to CBP at commentsenv@cbp.dhs.gov.  Please include "FY18 RGV Border Construction Projects" in the title of your email.  Comments received in response to this letter, including names and addresses of those who comment, will be part of the public record.  If you are providing a comment about a specific segment, please specify that in your comment (Weslaco Station AOR, McAllen Station AOR, or Rio Grande City AOR).

You may also use the above e-mail address to request project notifications.  Further information and Spanish-language materials are available at the following web site:

www.cbp.gov/about/environmental-cultural-stewardship/nepa-documents/docs-review

You may also submit comments, questions, or concerns to the following address:

U.S. Customs and Border Protection
U.S. Border Patrol Headquarters
1300 Pennsylvania Ave. 6.5E Mail Stop 1039
Washington, DC 20229-1100

We appreciate your feedback and help with evaluating the environmental impacts of these projects.

Sincerely,

Paul Enriquez
Acquisition, Real Estate and Environmental Director
Border Wall Program Management Office, U.S. Border Patrol



**U.S. Customs and Border Protection**

# Fiscal Year 2018 (FY18) Rio Grande Valley (RGV) Levee/Border Wall System Construction Projects Overview

The wall system will be similar to other levee and border wall system infrastructure located within the RGV Sector. Below you will find maps showing the locations for levee wall system in Hidalgo County and the border wall system in Starr County. The approximate mileage for each of the three U.S. Border Patrol (USBP) Areas of Responsibility (AOR) is as follows:



| Weslaco AOR | McAllen AOR | Rio Grande City AOR |
|:---:|:---:|:---:|
| APPROXIMATELY | APPROXIMATELY | APPROXIMATELY |
| **14** MILES | **11** MILES | **8-12** MILES |
| (Hidalgo County) | (Hidalgo County) | (Starr County) |

Regarding the approximately 25 miles of levee wall system in Hidalgo County, the proposed alignment would be situated on the south face of the northern U.S. International Boundary Water Commission (IBWC) levee. The proposed design includes a reinforced concrete levee wall system to the approximate height of the existing levee with 18-foot tall steel bollards installed on the top of the levee wall system. The project would also include a 150-foot enforcement zone on the south/river side of the levee wall system, detection and surveillance technology that would be incorporated into the levee wall system, automated vehicle gates, pedestrian gates, an all-weather patrol road that would run parallel to the levee wall system, and enforcement zone lighting.





**U.S. Customs and Border Protection**

Regarding the approximately 8 miles of border wall system in Starr County, with the option for 4 additional miles, proposed design includes 20- to 30-foot tall steel bollards, detection and surveillance technology that would be incorporated into the border wall design, pedestrian gates, and an all-weather patrol road parallel to the border wall system. It could also include a 150-foot enforcement zone on the south side of the border wall system and enforcement zone lighting.



## Additional details of the possible components of the projects are as follows:

- **Levee Wall—** The levee wall would be a concrete wall to the approximate height of the levee crest with 18-foot tall bollards installed in the top of the levee wall.

- **Border Wall System in Starr County—** The bollard wall would be 20- to 30-feet high utilizing 6"x6" concrete filled steel bollards.

- **150-foot Enforcement Zone—** The enforcement zone would be an area extending from the south/river side of the levee wall or border wall systems approximately 150 feet. All vegetation within the 150-foot enforcement zone will be cleared.

- **Gates—** Automated vehicle gates would be installed with a minimum height of 18 feet and minimum width of 20 feet.  In addition, gates designed to allow for farming equipment would be installed where appropriate and range in width from 40 to 50 feet. All gates will be motorized overhead sliding gates with an enclosed drive and operator system.

- **Lighting—** LED lighting would be installed as part of this project. CBP would work with the appropriate stakeholders to develop solutions to avoid excess lighting beyond the enforcement zone.

- **All Weather Road—** An all-weather aggregate patrol road (type FC-2) would be constructed on the south side and parallel to the levee or border wall system and within the 150-foot enforcement zone. The specific location of the road within the enforcement zone would be determined during the design phase of the project.

- **Cameras—** A camera surveillance system would be installed to monitor the wall, the enforcement zone, and southern approach.

# EXHIBIT 2

## SECOND DECLARATION OF LOREN FLOSSMAN

I, Loren Flossman, declare as follows:

1. I am the Acquisition Program Manager for the Wall Program Management Office (Wall PMO), U.S. Border Patrol Program Management Directorate, U.S. Customs and Border Protection (CBP), an agency of the Department of Homeland Security (DHS).  I have held this position since May 2018.  Prior to this, I was the Director of the Border Patrol & Air and Marine Program (BPAM) Management Office within the Office of Facilities and Asset Management, CBP.  BPAM is the office within CBP that historically was responsible for the construction and maintenance of facilities, tactical infrastructure, and border infrastructure such as barriers and roads that are required by the United States Border Patrol (Border Patrol) or CBP Air and Marine.  Responsibility for border barrier projects was transferred from BPAM to Wall PMO.  Therefore, Wall PMO is now responsible for border barrier projects, including the border barrier projects that are ongoing or being planned for the Rio Grande Valley sector.

2. The statements in this declaration are based on my personal knowledge and information that I have received in my official capacity.

### Funding of Border Barrier Construction in the Rio Grande Valley Sector

3. CBP is a U.S. Government Agency responsible for securing the Nation's borders. CBP's mission is to prevent terrorists and terrorist weapons from entering the United States, and to detect, interdict, and apprehend those who attempt to enter illegally or smuggle any person or contraband across the Nation's borders.  CBP is specifically responsible for patrolling nearly 6,000 miles of Mexican and Canadian international land

borders and over 2,000 miles of coastal waters surrounding the Florida Peninsula and the island of Puerto Rico.

4. CBP divides its enforcement zones along the southern border with Mexico into nine sectors.  From west to east, the sectors are:  San Diego, El Centro, Yuma, Tucson, El Paso, Big Bend, Del Rio, Laredo, and Rio Grande Valley (RGV).

5. The RGV covers more than 34,000 square miles of southeast Texas and includes the following Texas counties:  Cameron, Willacy, Hidalgo, Starr, Brooks, Kenedy, Kleberg, Nueces, San Patricio, Jim Wells, Bee, Refugio, Calhoun, Goliad, Victoria, DeWitt, Jackson, Matagorda, Brazoria, Galveston, Chambers, Jefferson, Wharton, Fort Bend, Colorado, Austin, Waller, Montgomery, Liberty, Hardin, Orange, Harris, Aransas, and Lavaca.  Border Patrol in the RGV is responsible for securing approximately 300 river miles along the Rio Grande River separating the United States and Mexico as well as approximately 300 miles of coast along the Gulf of Mexico.

6. The RGV currently has approximately 54.9 miles of border barrier.  This mileage is predominantly steel bollard, levee wall systems but also includes steel bollard, pedestrian wall systems.

7. The barrier projects, both planned and ongoing, in the RGV are for levee and pedestrian barrier systems.  The wall system includes steel bollards, a 150-foot enforcement zone on the river side of the wall system, detection and surveillance technology, vehicle and pedestrian gates, lighting, and an all-weather road running parallel to the barrier.

8. All barrier construction projects currently ongoing or planned in the RGV are or will be funded from one of three sources:  (1) CBP's Fiscal Year 2018 appropriations (Public Law No. 115-141, § 230); (2) CBP's Fiscal Year 2019 appropriations (Public Law No.

2

116-6, § 230); or (3) funds received from the Treasury Forfeiture Fund pursuant to 31 U.S.C. § 9705.  CBP will not use funds transferred pursuant to authorities invoked in the President's February 15, 2019 national emergency proclamation, including 10 U.S.C. § 2808, or pursuant to 10 U.S.C. § 284 for any ongoing or planned barrier construction in the RGV.

### CBP's Use of Treasury Forfeiture Funds

9. On December 26, 2018, DHS submitted a request to the United States Department of the Treasury (Treasury) to use Treasury Forfeiture Funds (TFF) in order to enhance border security infrastructure and operations in support of CBP's law enforcement efforts. Treasury approved DHS' request and, on February 15, 2019, notified Congress of this action.

10. TFF are being made available to CBP in two tranches.  The first tranche of $242 million was made available to CBP for obligation on March 14, 2019.  The second tranche of $359 million is expected to be made available for obligation at a later date upon Treasury's receipt of additional anticipated forfeitures.

11. CBP's Fiscal Year 2019 appropriation provided $1.375 billion for the construction of primary pedestrian fencing in the RGV.  CBP intends to start obligating these funds in the near future, but may not finish obligating the entirety of these funds before it begins to obligate TFF funds.  Although CBP has not made any decisions about when it will begin obligating TFF funds, CBP intends to obligate all available TFF funds before the end of Fiscal Year 2019 or, if not, before the end of the 2019 calendar year.

12. With respect to funding barrier construction along the southern border, CBP will use TFF funds exclusively for projects in the RGV.  CBP will not use TFF funds to build

3

barrier construction projects in the other eight sectors along the southern border.  CBP

may use some TFF funds for planning related to barrier construction projects in other

sectors, but no decisions have been made to use TFF funds for that purpose.

This declaration is made pursuant to 28 U.S.C. § 1746.  I declare under penalty of perjury that

the foregoing is true and correct to the best of my current knowledge.

Executed on this _1_ day of April, 2019.

Loren Flossman

Digitally signed by Loren Flossman
DN: cn=Loren Flossman, o=Border
Wall PMO, ou=Portfolio Manager,
email=Loren.w.flossman@cbp.dhs.go
v, c=US
Date: 2019.04.01 07:46:58 -04'00'

Loren Flossman
Acquisition Program Manager
U.S. Customs and Border Protection

# EXHIBIT 3

DECLARATION OF KENNETH P. RAPUANO

I, KENNETH P. RAPUANO, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Assistant Secretary of Defense for Homeland Defense and Global Security (ASD(HD&GS)). Among other duties, which are generally reflected in Department of Defense (DoD) Directive 5111.13, I am responsible for developing, coordinating, and overseeing implementation of DoD policy for plans and activities related to defense support of civil authorities. The Secretary of Defense established and designated the ASD(HD&GS) to manage the DoD Border Security Support Cell, on April 5, 2018. The DoD Border Security Support Cell is the focal point and integrator for all requests for assistance, taskings, and information related to DoD support pursuant to the President's April 4, 2018, memo, "Securing the Southern Border of the United States."

2. This declaration is based on my own personal knowledge and information made available to me in the course of my official duties.

3. On February 15, 2019, the President of the United States, in accordance with the National Emergencies Act, 50 U.S.C. §§ 1601-1651, declared that a national emergency exists at the southern border of the United States. In accordance with the declaration, the President invoked section 12302 of title 10, United States Code, and made that statutory authority available, according to its terms, to the Secretaries of the military departments concerned, subject to the direction of the Secretary of Defense in the case of the Secretaries of the Army, Navy, and Air Force. To provide additional authority to DoD in support of the Federal Government's response to the national emergency at the southern border, the President declared that this emergency requires use of the armed forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. § 1631), that the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments. *See* Exhibit A.

4. Under section 2808, whenever the President declares a national emergency "that requires use of the armed forces," the Secretary of Defense may undertake or authorize military construction projects "not otherwise authorized by law that are necessary to support such use of the armed forces" 10 U.S.C. § 2808(a). The Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under section 2808. To inform the Acting Secretary's decision, on March 20, 2019, the Secretary of Homeland Security provided a prioritized list of proposed border barrier construction projects that the Department of Homeland Security (DHS) assesses would improve the efficiency and effectiveness of the armed forces supporting DHS in securing the southern border. To further inform his decision, the Acting Secretary will also seek the military advice of the Chairman of the Joint Chiefs of Staff.

5. The DoD Comptroller will consult with the military departments to examine which military construction projects that are projected to be awarded in fiscal year 2020 or later might be deferred to fund barrier construction projects, in the event the Acting Secretary determines that

such projects are necessary to support the use of the armed forces. When evaluating the potential funding sources for potential section 2808 construction projects, DoD will consider (1) projects not yet awarded that could potentially be deferred, (2) projects that are scheduled to be awarded after fiscal year 2019, and (3) projects that pose minimal operational or readiness risks if delayed. Family housing, barracks, and dormitory projects will not be used as potential funding sources.

***

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on: April _1_ , 2019

_____
KENNETH P. RAPUANO

# EXHIBIT A

DECLARING A NATIONAL EMERGENCY CONCERNING THE SOUTHERN BORDER
OF THE UNITED STATES

- - - - - - -

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

The current situation at the southern border presents
a border security and humanitarian crisis that threatens
core national security interests and constitutes a national
emergency.  The southern border is a major entry point for
criminals, gang members, and illicit narcotics.  The problem
of large-scale unlawful migration through the southern border
is long-standing, and despite the executive branch's exercise
of existing statutory authorities, the situation has worsened
in certain respects in recent years.  In particular, recent
years have seen sharp increases in the number of family units
entering and seeking entry to the United States and an inability
to provide detention space for many of these aliens while their
removal proceedings are pending.  If not detained, such aliens
are often released into the country and are often difficult to
remove from the United States because they fail to appear for
hearings, do not comply with orders of removal, or are otherwise
difficult to locate.  In response to the directive in my
April 4, 2018, memorandum and subsequent requests for support
by the Secretary of Homeland Security, the Department of Defense
has provided support and resources to the Department of Homeland
Security at the southern border.  Because of the gravity of the
current emergency situation, it is necessary for the Armed
Forces to provide additional support to address the crisis.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested
in me by the Constitution and the laws of the United States
of America, including sections 201 and 301 of the National
Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that

2

a national emergency exists at the southern border of the
United States, and that section 12302 of title 10, United States
Code, is invoked and made available, according to its terms, to
the Secretaries of the military departments concerned, subject
to the direction of the Secretary of Defense in the case of
the Secretaries of the Army, Navy, and Air Force.  To provide
additional authority to the Department of Defense to support the
Federal Government's response to the emergency at the southern
border, I hereby declare that this emergency requires use of
the Armed Forces and, in accordance with section 301 of the
National Emergencies Act (50 U.S.C. 1631), that the construction
authority provided in section 2808 of title 10, United States
Code, is invoked and made available, according to its terms, to
the Secretary of Defense and, at the discretion of the Secretary
of Defense, to the Secretaries of the military departments.
I hereby direct as follows:

Section 1.  The Secretary of Defense, or the Secretary of
each relevant military department, as appropriate and consistent
with applicable law, shall order as many units or members of the
Ready Reserve to active duty as the Secretary concerned, in the
Secretary's discretion, determines to be appropriate to assist
and support the activities of the Secretary of Homeland Security
at the southern border.

Sec. 2.  The Secretary of Defense, the Secretary of the
Interior, the Secretary of Homeland Security, and, subject to
the discretion of the Secretary of Defense, the Secretaries of
the military departments, shall take all appropriate actions,
consistent with applicable law, to use or support the use of
the authorities herein invoked, including, if necessary, the
transfer and acceptance of jurisdiction over border lands.

3

Sec. 3.  This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this fifteenth day of February, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-third.



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NAYDA ALVAREZ, *et al.*,

                Plaintiffs,

    v.                                                                  No. 19-cv-00404 (TNM)

DONALD J. TRUMP, in his official capacity as
President of the United States of America, *et al.*,

                Defendants.

---

## [PROPOSED] ORDER

      Upon consideration of Defendants' Motion to Dismiss, it is hereby **ORDERED** that the

Motion is **GRANTED**.

      **SO ORDERED.**


Dated: _____, 2019


                        _____

                        TREVOR  N. McFADDEN
                        United States District Judge